## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-CV-24467-MOORE/Elfenbein

**THOMAS RAYNARD JAMES**,

     Plaintiffs,

v.

**DETECTIVE KEVIN CONLEY**, *et al.*,

     Defendants.

_____/

## <u>ORDER ON DISCOVERY MOTION</u>

**THIS CAUSE** is before the Court on the Notice of Hearing (the "Notice") submitted by counsel for Natalie Figgers, Esq. ("Ms. Figgers") in which she requested a protective order to prevent Defendants from taking her deposition.  *See* ECF No. [146]. As scheduled, the Parties appeared before the Court on July 24, 2025 to address the noticed discovery issue (the "Hearing"). *See* ECF No. [151].

### I.     BACKGROUND

Plaintiff, Thomas Raynard James ("Plaintiff"), has filed claims against Defendants Detective Kevin Conley and Detective Charles McCully individually under 42 U.S.C. § 1983 for denial of a fair criminal proceeding in violation of the Due Process Clause of the Fourteenth Amendment (Count 1); federal malicious prosecution and seizure in violation of the Fourth Amendment (Count 2); and deprivation of liberty and denial of fair criminal process in violation of the Due Process Clause of the Fourteenth Amendment (Count III); and he has filed a claim against Miami-Dade County for failure to adequately train pursuant to *Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. 658 (1978) (Count IV).  *See* ECF No. [138].  The case stems

from Plaintiff's wrongful conviction for the 1990 murder of Francis McKinnon, which the Circuit Court of the Eleventh Judicial Circuit vacated on April 27, 2022 — nearly 32 years later. Critically important to the issues in the Motion for Protective Order, Dorothy Walton, who was an eye witness to the murder and who identified Plaintiff at trial as the shooter, recanted her identification approximately three decades later. As explained below, the exact timing of her recantation and to whom she first recanted remains unclear. Nonetheless, sometime after Ms. Walton's retraction was brought to the attention of the State Attorney's Office, Plaintiff's conviction was vacated and this lawsuit thereafter ensued.

Now, Defendants desire to depose Ms. Figgers, a lawyer who represented Plaintiff during the effort to vacate his conviction and then continued representing him in this lawsuit, *see* ECF No. [1], because they believe that Dorothy Walton first changed her eye-witness identification during a conversation between Ms. Walton, Ms. Figgers, and her paralegal.[1] Because of the dramatic change in positions, Defendants would like to depose Ms. Figgers to understand what was said during this interview that led Ms. Walton to change her trial testimony and deny that Plaintiff was the shooter in the murder of Mr. McKinnon.

During the Hearing, Ms. Figgers, through her counsel, made an Oral Motion for Protective Order (the "Motion"), ECF No. [168], arguing that, because she is counsel for the Plaintiff, Defendants should not be allowed to depose her and asking the Court to apply the three-part test in *Shelton v. Am. Motors Corp.,* 805 F.2d 1323, 1327 (8th Cir. 1986). Applying this test, Ms. Figgers argued that (1) Defendants had already explored the answers to these questions with other witnesses and did not like the answers they received; (2) to the extent Ms. Figgers has relevant information, Defendant has other avenues from which to obtain the requested information, such as

---

[1] During the Hearing, the Parties only referred to her as Ms. Figgers's "paralegal" but did not refer to her by name.

the deposition of Ms. Figgers's paralegal; (3) questions during the deposition may require Ms. Figgers to disclose her mental impressions, and (4) the information sought is not crucial to Defendants' preparation of their case.  Finally, Defendants argued that Defendants' request to depose Ms. Figgers was harassing and would be burdensome because it would disrupt the litigation team.

Throughout the hearing, Defendants disputed whether the depositions taken to date in the case answered a central question — why did Ms. Walton recant her prior trial testimony identifying the Plaintiff as the shooter?  To support their position, Defendants argued that they deposed numerous fact witnesses to obtain the answer to this question without success, such as by deposing Ms. Walton; Jennifer Nepstad, who interviewed Ms. Walton as part of the investigation done by the Innocence Project; and Heather Walker, an investigative reporter who interviewed Ms. Walton. According to Defendants, none of these witnesses could answer this critical question, and because Ms. Figgers made herself a fact witness when she interviewed Ms. Walton, Defendants argued that she is not immune from deposition.  Defendants also emphasized that they did not intend to make any inquiry into Ms. Figgers's mental impressions and would instead focus on the facts of the interview, such as by asking Ms. Figgers what she said to Ms. Walton, and then asking her what Ms. Walton said in response, and then exhausting that line of questioning until the conclusion of the conversation between Ms. Figgers and Ms. Walton.   The Defendants also explained that, in their view, this information is crucial to the defense of their case as it relates to the existence of probable cause at the time of Plaintiff's arrest in 1990 and to the reasonableness of law enforcement using Ms. Walton as a witness during the murder investigation.

At the Hearing, the Court did not have the benefit of the deposition testimony, so it took the Motion under advisement and ordered the Parties to file those portions of the relevant

deposition transcripts.  *See* ECF No. [151].  Since then, the Parties each submitted those portions

of the transcripts they believe are relevant to the issues here, *see* ECF No. [154] and ECF No.

[157][2], which the Court summarizes, in relevant part, below.

## II.    DEPOSITION TESTIMONY

### 1.    Sworn statement taken of Dorothy Walton on April 12, 2022 by the State Attorney's Office

After the State Attorney's Office learned that Ms. Walton recanted her prior trial testimony

and stated that Plaintiff was not the shooter, the State Attorney's Office took her sworn statement

on April 12, 2022.  *See generally* ECF No. [154-3].  In large part, Ms. Walton's answers to

questions during the sworn statement consisted of "I don't recall" or words to that effect.

Nonetheless, she provided answers to many questions.  She testified that, in the criminal trial 30

years ago, she "tried to" tell the truth but she made "a mistake."  *See* ECF No. [154-3] at 8.[3]  She

explained that she does not know the Plaintiff, his family, or his mother.  *See* ECF No. [154-3] at

11.  When asked whether a lawyer who represents Plaintiff went to her home, she testified that "so

many people have been to [her] house" and she cannot "tell one from the other," but she

remembered a reporter speaking with her two weeks before her sworn statement and asking her

some questions.  *See* ECF No. [154-3] at 12.  Ms. Walton, however, denied providing the reporter

any information about the case.  *See* ECF No. [154-3] at 13.

When asked whether she recalled speaking with Ms. Figgers, she testified the name seemed

familiar, but she could not recall a conversation with Ms. Figgers because she has spoken to so

---

[2] The Parties provided many overlapping deposition pages for each transcript.  As the submission at ECF
No. [154] is more comprehensive, the Court cites to that submission for any overlapping pages from the
transcripts.  To the extent ECF No. [157] provided additional non-duplicative deposition pages, the Court
refers to that docket entry.

[3] The citations to page numbers refer to the CM-ECF pagination number, not to the page number on the
deposition transcript.

many people, telling them all that "Thomas James was not the person in my living room, in my mom's living room, I made a mistake." *See* ECF No. [154-3] at 13. She could not recall whether she said these things to investigators from the State Attorney's Office, who visited her, or to other employees from the State Attorney's Office, who called her about the case, but she testified that "if you spoke to me about the situation," "9 out 10 times if I recall I would have told you he [referring to Plaintiff] was not the person in my mother's living room." *See* ECF No. [154-3] at 14. The prosecutor asked Ms. Walton when she first formed an opinion that Plaintiff was not the person in her mother's living room, but she could not recall the specific timeframe, explaining it "has been a long time." *See* ECF No. [154-3] at 15.

The State Attorney's Office also asked her about an interview conducted by the Innocence Project that was memorialized in a memorandum dated January 14, 2019. *See* ECF No. [154-3] at 16-21. She testified that she formed her opinion that Plaintiff was not the shooter "years before [she] talked to these people from the Innocence Project" and that she told them that "the first one was not the person that shot my stepfather." *See* ECF No. [154-3] at 22. When asked directly whether she told the two men from the Innocence Project in January 2019 that Plaintiff "was not the trigger man who killed [her stepfather]," Ms. Walton responded: "I sure did." *See* ECF No. [154-3] at 24.

During the sworn statement, the prosecutor also read into the record some information from documents in Plaintiff's parole file stating that Ms. Walton "is terrified of inmate" "because she testified"; Ms. Walton "is very fearful" as "the inmate has written her in the past, and just wrote to her daughter a year ago," stating "that he did not do it, and that it was a mistaken identity"; and "[s]he fears for her family's life." *See* ECF No. [154-3] at 26. In response, Ms. Walton testified that this information "sounds familiar" and explained it refers to "being fearful of anybody"

"whether it was Thomas" (Plaintiff) "or whoever was in my mom's living room." *See* ECF No. [154-3] at 26-27. Despite these fears, Ms. Walton testified: "I realize and deep down inside and I know that I made a mistake." *See* ECF No. [154-3] at 27. Ms. Walton denied that she received any threats, offers, or promises for her to testify this way. *See* ECF No. [157-1] at 18.

**2. Deposition of Dorothy Walton taken on August 12, 2024**

Much like during her sworn statement, Ms. Walton's answers to many questions during her deposition were words to the effect of "I don't recall." *See generally* ECF No. [154-4]; ECF No. [157-2]. When asked whether there is any reason she would not have told the truth when she testified in 1990 or whether she would not have told the truth when she picked out the Plaintiff during a lineup in 1990, Ms. Walton answered: "No." *See* ECF No. [154-4] at 12-13. In response to a question inquiring whether she can think of any reason her testimony would have been inaccurate in 1990, she testified: "I don't know. My stepfather was just killed. A gun was just to my husband's head . . . like I said — I made a mistake. It was not Thomas James." *See* ECF No. [154-4] at 14.

During her deposition, defense counsel pressed Ms. Walton to obtain an explanation as to "why at one point [she was] absolutely certain Thomas Raynard James was the subject and why 32 years later [she's] certain it was not." *See* ECF No. [154-4] at 15. Ms. Walton's only explanation was that "it was a mistake," but she would not answer how she realized it was a mistake, repeatedly saying things like: "I'm not going to answer it." *See* ECF No. [154-4] at 16-17. Ms. Walton could not recall when she realized that she made this mistake or whether she ever told anyone how she realized she made this mistake. *See* ECF No. [157-2] at 17-19, 24. She likewise could not recall whether she spoke with Ms. Figgers in late 2020 or early 2021. *See* ECF No. [157-2] at 25. She did, however, recall speaking with someone on the phone from "some

organization or something" and she "told them that Thomas James did not do it." *See* ECF No. [157-2] at 25.

### 3. Deposition of Jennifer Nepstad taken May 16, 2025

During the deposition of Ms. Nepstad, she testified that the attorneys from the Innocence Project tasked her and David Mack with interviewing Ms. Walton as the only witness who positively identified Plaintiff in the criminal case. *See* ECF No. [154-5] at 14, 20. She recalled that the interview lasted about 35 minutes at her home and took place through the opening of her front door. *See* ECF No. [154-5] at 22-23, 41, 47-48. Mr. Mack informed Ms. Walton that they wanted to hear her side of the story, and he discussed the unreliability of eyewitness testimony with her. *See* ECF No. [154-5] at 25. In response, Ms. Walton asked whether the interviewers wanted her to say that she misidentified the shooter, at which point Ms. Nepstad explained that they were interested in the truth and would not tell her what to say. *See* ECF No. [154-5] at 25. Mr. Mack also informed her that she was the only witness who identified Plaintiff as the shooter and asked her if she thought it was possible that she misidentified Plaintiff, at which point Ms. Walton said: "anything is possible." *See* ECF No. [154-5] at 14, 27-28. Ms. Walton also "remarked that it would be a tragedy if she helped put an innocent man wrongfully in prison." *See* ECF No. [154-5] at 28.

When discussing her fear of Plaintiff, Ms. Walton told them that she feared that an innocent man would seek revenge against her for helping put him wrongfully in prison. *See* ECF No. [154-5] at 28. Ms. Walton also asked why Ms. Nepstad and Mr. Mack believed Plaintiff was innocent, and, in response, they explained that their belief was "based on other people's identifications, as well as other things people had told [them]" leading them to believe that Vincent Williams "was the shooter." *See* ECF No. [154-5] at 28-29. Ms. Walton then repeatedly told the investigators to

speak with Vincent Williams, and the conversation ultimately ended with Ms. Walton "saying she was going to seek some guidance from some of her family members who were in law enforcement" and "she wanted to pray on this." *See* ECF No. [154-5] at 29, 52.  Ms. Walton did not make any further contact with Ms. Nepstad following the interview.  *See* ECF No. [154-5] at 52.

During the deposition, Ms. Nepstad was asked numerous questions about whether Ms. Walton ever admitted that she made a "mistake" in her identification of Plaintiff or whether Ms. Walton stated she was "unsure" or had any "doubts" about her identification.  *See* ECF No. [154-5] at 30, 54-55.  Ms. Nepstad explained that Ms. Walton said "anything is possible," which suggested that "she was open to the idea that she made a mistake" and misidentified Plaintiff.  *See* ECF No. [154-5] at 30-31, 54-56.  In addition, Ms. Walton repeatedly urged the investigators to speak with Vincent Williams and said it would be a "tragedy" to put "an innocent person wrongfully in prison," which left Ms. Nepstad with the impression that Ms. Walton was open to the idea that she misidentified Plaintiff.  *See* ECF No. [154-5] at 56.[4]

### 4. Deposition of Heather Walker taken June 3, 2025

Ms. Walker is a reporter who investigated Plaintiff's criminal case.  *See* ECF No. [154-6] at 3.  During her deposition, she testified that she contacted Ms. Walton at least twice on her front porch as part of her investigative work.  *See* ECF No. [154-6] at 3-4.  During the first encounter, Ms. Walker began to introduce herself to Ms. Walton and Ms. Walton interrupted mid-sentence, saying "I told them they got the wrong guy. I told them they got the wrong guy."  *See* ECF No. [154-6] at 4-5.  Ms. Walker testified that Ms. Walton was adamant and repeatedly said: "I told them they got the wrong guy."  *See* ECF No. [154-6] at 6.  When asked details about the interview,

---

[4] Ms. Nepstad also testified that, while Plaintiff was serving his sentence, he reached out to Ms. Walton in a letter around 2000 or 2001 and one of his friend's reached out to Ms. Walton's daughter.  *See* ECF No. [154-5] at 16-17.

such as who "they" is, whether "they" was the State Attorney's Office, or whether Ms. Figgers's name came up at the time Ms. Walton reported this information, Ms. Walker could not recall Ms. Walton's answers.  *See* ECF No. [154-6] at 6-7.  At some point, Ms. Walton closed the door to the home and the conversation ended, which took Ms. Walker by surprise.  *See* ECF No. [154-6] at 7. Ms. Walker could not recall anything else about this conversation, which lasted less than 10 minutes, such as whether Ms. Walton explained how she knew "they got the wrong guy."  *See* ECF No. [154-6] at 10-11.   This first interview was not recorded because the photographer was not "rolling" by mistake.  *See* ECF No. [154-6] at 10.  As a result, within minutes that same day, Ms. Walker went back with her photographer to get footage of her conversation with Ms. Walton, and they had the same sort of conversation, except that Ms. Walton did not open the door and instead spoke to Ms. Walker through a window.  *See* ECF No. [154-6] at 15-16.

Ms. Walker testified that something Ms. Walton said indicated that she (Ms. Walton) previously told the State Attorney's Office because Ms. Walker recalled calling the prosecutor immediately after this interview.  *See* ECF No. [154-6] at 8.  Indeed, Ms. Walker had the impression that Ms. Walton "had told someone else" that "they got the wrong guy."  *See* ECF No. [154-6] at 12.  Ms. Walker recalled that she told both Ms. Figgers and the State Attorney's Office what Ms. Walton told her.  *See* ECF No. [154-6] at 30-31.  Ms. Walker could not recall whether Ms. Walton said "she made a mistake" identifying Plaintiff as the shooter, whether Ms. Walton said she had spoken with anyone else regarding the misidentification, or whether Ms. Walton gave a reason for the mistaken identification.  *See* ECF No. [154-6] at 20.  Although Ms. Walker spoke with Ms. Figgers about Ms. Walton's role in misidentifying Plaintiff as the murder suspect, Ms. Walker could not recall anything that Ms. Figgers said or whether Ms. Figgers told her that Ms. Walton had misidentified Plaintiff.  *See* ECF No. [154-6] at 21, 23, 25.

## III.    DISCUSSION

It is generally accepted that "federal courts have disfavored the practice of taking the deposition of a party's attorney; instead, the practice should be employed only in limited circumstances." *Theriot v. Parish of Jefferson*, 185 F.3d 477, 491 (5th Cir. 1999) (denying deposition of defendant's trial attorneys was not an abuse of discretion); *see also Shelton*, 805 F.2d at 1327 ("The practice of forcing trial counsel to testify as a witness, however, has long been discouraged and recognized as disrupting the adversarial nature of our judicial system") (internal citations omitted).  Among the concerns with deposing opposing counsel are the disruption of the adversarial system, the lowering of standards of the profession and the quality of client representation, and the addition of litigation costs and burdens on the parties to litigate matters involving work-product and attorney-client privilege.  *Id.*  These concerns do not include the additional "chilling effect" that a practice of deposing litigation counsel can have on communications from clients to their lawyers.  *Id.*  With that said, courts recognize that "opposing trial counsel is [not] absolutely immune from being deposed."  *Id.*; *see also Bank of America, N.A. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. 12-CV-02422-SCJ, 2013 WL 12067452, at *2 (N.D. Ga. June 20, 2013) ("A lawyer's profession is not a talisman of privilege, automatically granting attorneys immunity from discovery under the federal rules.").

While the Eleventh Circuit has not yet adopted a test determining when the deposition of a litigation attorney is permissible, district courts in the Northern, Middle, and Southern Districts of Florida and other Circuits have adopted the *Shelton* test, which this Court has also adopted in the past.  *See e.g., Chesher v. Allen*, 122 Fed. App'x. 184, 188 (6th Cir. 2005); *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1112 (10th Cir. 2001); *Saldana-Snachez v. Lopez-Gerena*, 256 F.3d 1, 5, n. 9 (1st Cir. 2001); *Nguyen v. Excel Corp.*, 197 F.3d 200, 208 (5th Cir. 1999); *Hominski v.*

*Gusar LLC*, Case No. 24-CV-21590, ECF No. [120] (S.D. Fla. Apr. 3, 2025) (Elfenbein, J.); *Wilcox v. La Pensee Condo. Ass'n, Inc.*, 603 F. Supp. 3d 1291, 1294 (S.D. Fla. 2022); *Travelers Indem. Co. of Connecticut v. Richard McKenzie & Sons, Inc.*, No. 8:17-CV-2106-T-23CPT, 2018 WL 3391267, at *7 (M.D. Fla. Mar. 14, 2018); *D.O.T. Connectors, Inc. v. J.B. Nottingham & Co., Inc.*, No. 99-CV311-WS, 2001 WL 34104929 (N.D. Fla. Jan. 22, 2001); *LaJoie v. Pavcon, Inc.*, No. 97-312-CIV-FTM-25D, 1998 WL 526784 (M.D. Fla. June 24, 1998).[5]   In *Shelton.*, the Eighth Circuit recognized that parties cannot depose their opposing counsel except in extreme circumstances upon a showing that: (1) no other means exist to obtain the information sought; (2) the information sought is relevant and nonprivileged; and (3) the information sought is crucial to preparation of the case.  805 F.2d at 1327.  The Court addresses each factor in turn.

Starting with the first factor, during the Hearing, Defendant argued that after 30 years of insisting that Plaintiff murdered Francis McKinnon, Ms. Walton did not recant her identification until the moment she sat down with Ms. Figgers, so Defendants want to discover why Ms. Walton suddenly and dramatically changed her testimony.  However, throughout Defendants' argument, Defendant used language that suggested to the Court that the timing of Ms. Walton's recantation was based on conjecture and that no one truly knows exactly when Ms. Walton changed her

---

[5] Although Defendants suggested the Court apply the Second Circuit's "weighing and balancing test," Defendants also analyzed the issues under the *Shelton* test during the Hearing.  The "weighing and balancing test" requires "consideration of 'all of the relevant facts and circumstances to determine whether the proposed deposition would entail an inappropriate burden of hardship.'"  *Amin v. NBC Universal Media LLC*, No. 23-MC-2, 2024 WL 3169820, at *4 (M.D. Ga. May 24, 2024) (quoting *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 72 (2d Cir. 2003)).  The Court declines to apply the "weighing and balancing test" as the *Shelton* test appears to be more appropriate when a party seeks to depose litigation counsel, such as Ms. Figgers.  *Id.* (declining to apply the *Shelton* test because the attorney-deponent was not then and had never been counsel to a party involved in the lawsuit) (citations omitted); *Gaddy v. Texas Corp.*, No. 14-CV-1928-WSD, 2015 WL 1354586, at *4 (N.D. Ga. Oct. 28, 2025) (applying the "weighing and balancing" test because the attorney-deponents were in-house counsel, not litigation counsel, they had not appeared as counsel in the case, and were not actively involved in directing the lawsuit).  *But see Bank of America*, 2013 WL 12067452, at *3 (declining to apply either test and instead applying a test that focuses on balancing the need for the information balanced against the opposing party's interests in its attorney-client relationship).

testimony.  Indeed, during the Hearing, Defendants argued that Ms. Walton repeatedly testified at her deposition and in her sworn statement that she told "them" that she made a mistake and that "by [counsel's] best guess," "them" refers to Ms. Figgers and her paralegal.  Defendants further reiterated that "[t]he them [the Defendants] can best surmise was Ms. Figgers and her paralegal." Despite these assumptions, Defendants conceded that the conversation between Ms. Walton and Ms. Figgers remains a mystery to this day and that no one was "in the room where it happened." On the other hand, Ms. Figgers's counsel argued that Ms. Walton testified she had been telling the State Attorney's Office for years, but no one was listening, suggesting the recantation did not first happen with Ms. Figgers.

Based on the Court's review of the testimony, there are contradictory stories as to when the recantation happened, but none of those contradictory stories necessarily implicate Ms. Figgers as the first person who learned of it.  During her sworn statement to the State Attorney's Office, Ms. Walton testified that she formed her opinion that Plaintiff was not the shooter "years before [she] talked to these people from the Innocence Project" and that she told them that "the first one was not the person that shot my stepfather."  *See* ECF No. [154-3] at 22.  *When asked directly whether she told the interviewers from the Innocence Project in January 2019 that Plaintiff "was not the trigger man who killed [her stepfather]," Ms. Walton responded: "I sure did."  See* ECF No. [154-3] at 24.  Thus, according to Ms. Walton, she disclosed this information to the Innocence Project interviewers as early as January 2019, and neither of those individuals are identified as Ms. Figgers.

When looking at the deposition testimony of Ms. Walker, who appears to have interviewed Ms. Walton sometime in March 2022, Ms. Walton repeatedly told her: "I told them they got the wrong guy. I told them they got the wrong guy." *See* ECF No. [154-6] at 4-5.  During the interview,

Ms. Walton said something that led Ms. Walker to believe she previously told the State Attorney's Office because Ms. Walker called the prosecutor immediately after this interview and she recalled speaking with Ms. Figgers about Ms. Walton's statement too.  *See* ECF No. [154-6] at 8, 30-31. And then, Ms. Figgers wrote a letter to Ms. Walker dated March 23, 2022, that in part says under the heading "New evidence": "Despite the overall challenges in tracking down new suspects after 30 years, we finally have a new suspect, the location of the murder weapon, and *most recently, thanks to you, of course, a recantation of their main witness, the victim's stepdaughter, Dorothy Walton.* It is our belief that the SAO office had this information before we did."[6]  *See* ECF No. [154-6] at 38 (emphasis added).  This letter and the testimony suggest that Ms. Walker learned of the recantation before Ms. Figgers.  Thus, the deposition testimony presented by the Parties does not indicate that Ms. Walton recanted first to Ms. Figgers but instead suggests that she recanted to others, and Defendants' statements about what they surmise Ms. Walton meant about who "them" is appears to be conjecture.  Thus, the Court is hesitant to conclude that Ms. Figgers is the right witness to shed light as to why Ms. Walton recanted, which is the critical question Defendants seek answered.

But even if Ms. Figgers may have information about why Ms. Walton recanted, there are other individuals who may also have that information but have not yet been deposed and are not litigation counsel.  The most obvious choice is Ms. Figgers's paralegal, who both Ms. Figgers's counsel and Defendants' counsel recognized was in the room during the interview with Ms. Walton.  While Defendants argue that the deposition of the paralegal would present the same concerns as deposing Ms. Figgers, the Court disagrees.  First, it is unknown whether that paralegal is now part of or has ever been part of the litigation team in this case, as opposed to simply a

---

[6] As worded, it is unclear whether "this information" in the letter refers to the recantation, the new suspect, the location of the murder weapon, or all of the foregoing.

paralegal who worked on the post-conviction proceedings involving Plaintiff, and what impact her deposition would have on the litigation team in this case.  Unlike Ms. Figgers, who is concerned about potential disqualification problems down the road if she is a fact witness,[7] if the paralegal never worked on this litigation or if Plaintiffs' litigation team is willing to remove her from the case, the same concerns are not present.  And importantly, Ms. Figgers's counsel suggested that the paralegal would be an appropriate alternative to deposing Ms. Figgers, thereby eliminating any potential objection to that deposition.

In addition to the paralegal, a review of the depositions reveals that Mr. Mack, who spoke with Ms. Walton on behalf of the Innocence Project in January 2019, has not been deposed, and according to Ms. Walton, she told him that she made a mistake identifying Plaintiff as the shooter. Additionally, Ms. Walker, who did not remember the details of the interview of Ms. Walton, testified that her photographer was present throughout, so he may recall this information, but no one has asked him.  Thus, there appear to be three other witnesses who may have the information Defendants seek, including Ms. Figgers's paralegal who may be able to answer (1) when the interview between Ms. Figgers and Ms. Walton took place, (2) whether Ms. Walton recanted during that specific interview, and (3) if so, why she changed her testimony.  Thus, the Court finds that Defendants have not satisfied the first prong of the *Shelton* test.

With regard to prongs 2 and 3, the Court has little difficulty concluding that the information is not privileged and crucial to the preparation of Defendants' case.  Ms. Walton's recantation is a major focus of Plaintiffs' claims against Defendants.  Evidence explaining why she changed her testimony 30 years later may bear on whether there was probable cause for the prosecution and

---

[7] By making this statement, the Court is not opining whether Ms. Figgers's status as a potential fact witness would indeed disqualify her from further representation or whether it would limit her ability to undertake certain functions during the pre-trial and trial phases of the case.  The Court simply points out that this is a genuine issue of concern for Plaintiff and Ms. Figgers.

whether law enforcement reasonably relied on Ms. Walton as an eye witness to identify Plaintiff as the shooter.  Further, the Court finds that the information requested relating to Ms. Figgers's interview of Ms. Walton is not privileged.   Ms. Figgers does not have an attorney-client relationship with Ms. Walton, so the attorney-client privilege does not apply.   To the extent the attorney work-product could apply, Defendants do not intend to make any inquiries regarding Ms. Figgers's mental impressions or her strategy when interviewing Ms. Walton.  Defendants simply intend to elicit the facts regarding what Ms. Figgers asked and what Ms. Walton said in response — none of which is privileged.  During the Hearing, Ms. Figgers's counsel conceded that the latter is not privileged.

Thus, upon review of the deposition transcripts and the argument of counsel, the Court finds that, although Defendants satisfied the second and third prong, Defendants failed to satisfy *Shelton*'s first prong.   Ms. Figgers has, therefore, presented good cause for the entry of the requested protective order.   With that said, Ms. Figgers's status as an attorney does not confer talismanic immunity from being deposed, so Defendants may seek to revisit this issue if, after exhausting other avenues, they can demonstrate there are no other means to obtain this information and they have a good faith basis to believe Ms. Figgers has this information.

## IV.    CONCLUSION

Accordingly, it is **ORDERED and ADJUDGED** that Ms. Figgers's Oral Motion for Protective Order, **ECF No. [168]**, is **GRANTED**.  As explained above, should Defendants exhaust other means to obtain this information without success, Defendants may revisit the issue of Ms. Figgers's deposition.

CASE NO. 23-CV-24467-MOORE/Elfenbein

**DONE and ORDERED** in Chambers in Miami, Florida on August 26, 2025.

**MARTY FULGUEIRA ELFENBEIN**
**UNITED STATES MAGISTRATE JUDGE**

cc: All Counsel of Record

16