## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 1:23-cv-24467-KMM

THOMAS RAYNARD JAMES,

      Plaintiff,

v.

DETECTIVE KEVIN CONLEY, *et al.*,

      Defendants.

_____/

## **<u>ORDER</u>**

THIS CAUSE came before the Court upon Defendants Detective Kevin Conley ("Detective Conley") and Detective Charles McCully's ("Detective McCully") (collectively, "Defendants") Motion for Summary Judgment ("Defendants' Motion" or "Defs.' Mot.") (ECF 186) and Plaintiff Thomas Raynard James's ("Plaintiff") Motion for Summary Judgment on Count I and Memorandum of Law in Support of Motion ("Plaintiff's Motion" or "Pltff.'s Mot." and together, the "Motions") (ECF No. 188). Filed in connection with Defendants' Motion were Defendants' accompanying Statement of Material Facts ("Defs.' Stmt.") (ECF No. 185), Plaintiff's Response to Defendants' Statement of Material Facts ("Pltff.'s Resp. Stmt") (ECF No. 205), Plaintiff's Response to Defendants' Motion ("Plaintiff's Response" or "Pltff.'s Resp.") (ECF No. 206), Defendants' Reply in Support of their Motion ("Defendants' Reply" or "Defs.' Reply") (ECF No. 214), and Defendants' Reply in Support of Their Statement of Material Facts ("Defs.' Reply Stmt.") (ECF No. 211). Filed in connection with Plaintiff's Motion were Plaintiff's accompanying Statement of Material Facts ("Pltff.'s Stmt.") (ECF No. 187), Defendants' Response to Plaintiff's Statement of Material Facts ("Defs.' Resp. Stmt.") (ECF No. 203), Defendants' Response to

Plaintiff's Motion ("Defendants' Response" or "Defs.' Resp.") (ECF No. 204), Plaintiff's Reply in Support of his Motion ("Plaintiff's Reply" or "Pltff.'s Reply") (ECF No. 210), and Plaintiff's Reply in Support of his Statement of Material Facts ("Pltff.'s Reply Stmt.") (ECF No. 209). The Motions are now ripe for review. As set forth below, Defendants' Motion is GRANTED and Plaintiff's Motion is DENIED.

## I.    BACKGROUND

This case concerns the incarceration of Plaintiff after he was wrongly convicted of murdering Francis McKinnon. (ECF No. 193). On January 17, 1990, Francis McKinnon was shot and killed in his home in Coral Gables, Florida, during an armed robbery. Defs.' Stmt. ¶ 1. That night, two men burst into Mr. McKinnon's home; one wore a hat or cap, but no mask, while the other was masked. Pltff.'s Stmt. ¶¶ 1–2. The unmasked man was armed. *Id.* ¶ 3. He ordered those in the living room and kitchen (a group that included Dorothy and John Walton, Ethra McKinnon, Jasmine Byrd, Lance Jacques, and Robert Tamsie Smith), to get on the ground. *Id.* Ms. Walton looked up at the unmasked man while he rummaged through her purse. Defs.' Stmt. ¶ 28–29. At this point, Mr. McKinnon left his bedroom. Defs' Stmt. ¶ 6. Mr. McKinnon was shot and killed by one of the assailants,[1] and both quickly fled the scene. *Id.*; Pltff.'s Stmt. ¶ 6.

Detective Conley, of the Metro-Dade Police Department ("MDPD"), was the lead investigator on the murder investigation. Defs.' Stmt. ¶ 9. He learned on the scene of the crime that a possible suspect's nickname was "Dog." *Id.* ¶ 12. Detective Conley then told Detective McCully, also of the MDPD, to conduct a canvass of the apartment complex where the shooting had occurred. *Id.* ¶ 14. Detective McCully spoke to residents of the apartment complex, including

---

[1]Ethra McKinnon would go on to say the unmasked man is the one who shot Mr. McKinnon. Pltff.'s Stmt. ¶ 8. Jasmine Byrd and Lance Jacques also stated the same. Pltff.'s Resp. Stmt. ¶ 31. Ms. Walton heard one shot fired, but did not know who fired the shot. Defs.' Stmt. ¶ 31.

Larry Miller. *Id.* ¶ 15.  Larry Miller said he was approached by two men before the shooting. *Id.* ¶ 17; Pltff.'s Stmt. ¶ 13.  He described one of the men as heavyset and wearing a white shirt, and noted this man asked him for a cigarette.  Defs.' Stmt. ¶ 17; Pltff.'s Stmt. ¶ 13.

The night of the murder, Ethra McKinnon, Dorothy Walton, and John Walton went to the MDPD and gave sworn statements.  Defs.' Stmt. ¶¶ 24–25.  There, Ms. Walton described the unmasked suspect as wearing "an off-white or beige white or beige sweater, with buttons down the front and a collar," noting that he was "black, approximately late twenties or early thirties, and five-foot seven to five-foot eight," and "maybe close to two hundred pounds, but not fat." *Id.* ¶ 26 (internal quotations omitted).  Detective Conley then showed each of the witnesses a photo lineup that did not feature Plaintiff. *Id.* ¶ 32.  Detective Conley testified at his deposition that none of the witnesses made an identification using this array. *Id.* ¶ 35. *But see* Pltff.'s Resp. Stmt. ¶ 35 (disputing the testimony's truthfulness based on Detective Conley's fieldnotes).

Regina Ortiz, a resident of the apartment complex, told Detective McCully that her sister said a man named "Thomas James" was involved in the murder.  Defs.' Stmt. ¶ 21.  Two 911 callers also reported "Tommy James" was a murder suspect. *Id.* ¶ 22.  One caller specified that both assailants were "from the Grove."  Pltff.'s Stmt. ¶ 21.  Plaintiff lived in or around Hialeah, not Coconut Grove. *Id.* ¶ 31.  Detective Conley then constructed new arrays, this time after reviewing a report with individuals named "Thomas James" that matched the potential profile of the assailants.  Defs.' Stmt. ¶¶ 39–40.[2]  The MDPD's Records Bureau created the report.  Pltff.'s Stmt. ¶ 24.  Plaintiff was one of the men in the report, as was a 17-year-old Thomas James from the Grove. *Id.* ¶ 25.  The latter was in jail on the night of the murder. *Id.* ¶ 27.  Eventually,

---

[2] The Court notes that Defendants name a different computerized printout in their statement of facts than the one in Detective Conley's file.  Pltff.'s Resp. Stmt. ¶¶ 40–41; Defs.' Reply at 15.

Detective Conley created two six-photo arrays, one including a photo of Vincent Williams, another suspect in the case, and the other including a picture of Plaintiff.  Defs.' Stmt. ¶ 46, 48.  Detective Conley compiled each array himself, although Detective McCully was also present when the arrays were presented to witnesses.  *Id.* ¶ 51.

Affixed to the back of each photo array was a set of "Photographic Identification General Guidelines" ("Photo Array Guidelines").[3]  *Id.* ¶ 52.  It is disputed whether these guidelines were a policy of the MDPD.  *Id.* ¶ 54; Pltff.'s Resp. Stmt. ¶ 54.  Detective Conley went to Ms. Walton's home and showed her both arrays.  Defs.' Stmt. ¶ 56.  Detective Conley did not read her the admonitions in the Photo Array Guidelines, but he testified that he asked her "Do you recognize anyone?"  *Id.* ¶¶ 57–58.  Ms. Walton identified Plaintiff, signing and dating the back of his photograph.  *Id.* ¶¶ 59–60.  She did not identify anyone in the other photo array.  *Id.* ¶ 61.  Neither Ethra McKinnon nor John Walton selected Plaintiff's photograph when shown the arrays.  *Id.* ¶ 62.  Detective Conley also showed the photos to Regina Ortiz, who did not identify anyone in Plaintiff's array but did identify Vincent Williams as fleeing the scene with a gun.  *Id.* ¶¶ 63–64.  Detective Conley took the photo array to Mr. Miller, who identified Plaintiff as being the man who had asked him for a cigarette before the shooting.  *Id.* ¶ 67.  He then signed the back of the same photograph that had already been signed by Ms. Walton.  *Id.* ¶ 68.  Mr. Miller later told Ms. Walton that he had also identified Plaintiff's picture in the array.  Pltff.'s Stmt. ¶ 55.

---

[3] In relevant part, the Photo Array Guidelines state the following: officers are to admonish witnesses that the array "may or may not contain a picture of the person who committed the crime now being investigated" and that they are not to "tell other witnesses that [they] have or have not identified anyone"; witnesses who select a photo "should be questioned about the reasons that particular photo resembles the suspect"; "[c]omments by a witness who is shown photographs in a Photo Display Folder should be recorded as part of a Formal Statement"; and "[w]itnesses should not be told that they have picked the 'right' or 'wrong' photo."  (ECF No. 187-24).

Detective Conley sought a warrant for Plaintiff's arrest and submitted an affidavit indicating that a witness inside Francis McKinnon's apartment had identified Plaintiff as being the shooter. Defs.' Stmt. ¶ 73. His decision to seek a warrant was approved by an Assistant State Attorney ("ASA"), and Plaintiff was arrested in connection with the murder on July 19, 1990. *Id.* ¶¶ 77–79. An ASA was assigned to the case and ultimately presented it to a grand jury, which indicted Plaintiff on charges of first-degree murder, burglary, robbery, and aggravated assault. *Id.* ¶¶ 81, 91. Detective Conley was deposed by the ASA in 1990 and testified that he destroyed hand-written notes he had taken during the investigation. *Id.* ¶ 187. Despite this testimony, the homicide file contained Detective Conley's notepad. *Id.* ¶ 188. The notepad included notes from the night of the murder, when the initial photo array was shown to Dorothy Walton, John Walton, and Ethra McKinnon. *Id.* It is disputed what portions of these notes said. *See id.* ¶¶ 188, 192–93 (explaining that Plaintiff did not ask Detective Conley to read his notes from the homicide file); Pltff.'s Stmt. ¶¶ 17–18; Pltff's Resp. Stmt. ¶ 193 (arguing that notes read "she photo line up maybe 1/ he can't ID / wife no ID" and that "she" refers to Ms. Walton).

Plaintiff's first-degree murder trial began on January 8, 1991. Pltff.'s Stmt. ¶ 61. At trial, Mr. Miller was unable to identify anyone, and his pretrial identification was introduced into evidence instead. *Id.* ¶¶ 62–63. Ms. Walton identified Plaintiff at trial, and this identification and her pretrial identification were both introduced into evidence. *Id.* ¶ 64. These identifications were the only evidence of Plaintiff's guilt introduced by the State at his trial. *Id.* ¶ 65. Plaintiff's defense counsel did not move to suppress the photographic identifications. Defs.' Stmt. ¶ 149. Plaintiff was convicted on all counts by a jury on January 11, 1991. (ECF No. 185-27) at 600. More than thirty years later, Plaintiff's conviction was vacated on April 27, 2022, after Ms. Walton recanted her identification. Defs.' Stmt. ¶¶ 172–84.

Plaintiff brought the instant action on November 23, 2023.  *See* (ECF No. 1). Now, Plaintiff seeks monetary damages pursuant to 42 U.S.C. § 1983.  (ECF No. 193)[4] ("FAC") ¶ 16. He brings suit for the following:  (1) denial of fair criminal proceedings in violation of the due process clause of the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983, for the use of unduly suggestive identification procedures to produce false identifications of Plaintiff that were introduced at trial, against Detectives Conley and McCully in their individual capacities ("Count I"); (2) federal malicious prosecution and seizure in violation of the Fourth Amendment, pursuant to 42 U.S.C. § 1983, for institution of criminal charges without probable cause, against Detectives Conley and McCully ("Count II"); (3) deprivation of liberty and denial of fair criminal process in violation of the due process clause of the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983, for concealment of exculpatory and impeachment evidence ("Count III"); and (4) failure to adequately train pursuant to 42 U.S.C. § 1983 and *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), against Defendant Miami-Dade County ("Count IV").  *Id.* ¶¶ 220–366. Count IV is not at issue here.

Now, Detectives Conley and McCully have moved for summary judgment as to Counts I, II, and III, whereas Plaintiff has moved for partial summary judgment as to Count I.  *See* Defs'

---

[4] The Court is aware that both Parties moved for summary judgment before Plaintiff filed his Fifth Amended Complaint on November 30, 2025.  The Court could deny both Motions as moot for this reason.  *Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1345 n.1 (11th Cir. 1999); *Santiago v. Jaguar Therapeutics, LLC*, No. 17-CV-22749, 2019 WL 4731980, at *1 (S.D. Fla. Jan. 17, 2019).  However, upon examination of the Fourth Amended Complaint, at (ECF No. 138), and the Fifth Amended Complaint, at (ECF No. 193), the Court notes Plaintiff has not changed any of the allegations as to these Defendants.  Instead, the Fifth Amended Complaint's changes all pertain to Defendant Miami-Dade County, who has not moved for summary judgment here.  Because the allegations as to Detectives Conley and McCully are not changed in the Fifth Amended Complaint, and in light of the Parties' extensive briefing on the instant Motions, the Court declines to deny these Motions as moot.

Mot.; Pltff.'s Mot.  Both Motions center around questions of whether Defendants were entitled to qualified immunity.  *See generally* Defs' Mot.; Pltff.'s Mot.

## II.    LEGAL STANDARD

### A.  Summary Judgment

Summary judgment is appropriate where there is "no genuine issue as to any material fact [such] that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56).  A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted).  "For factual issues to be considered genuine, they must have a real basis in the record."  *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009) (citation omitted).  Speculation cannot create a genuine issue of material fact sufficient to defeat a well-supported motion for summary judgment.  *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).

The moving party has the initial burden of showing the absence of a genuine issue as to any material fact.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  In assessing whether the moving party has met this burden, a court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the non-moving party.  *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001).  Once the moving party satisfies its initial burden, the burden shifts to the non-moving party to present evidence showing a genuine issue of material fact that precludes summary judgment.  *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); Fed. R. Civ. P. 56(e).  "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment."  *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citation omitted).  But if the record, taken as a

whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

### B. Qualified Immunity

Government officials sued in their individual capacities enjoy qualified immunity "where their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Quinette v. Reed*, 806 F. App'x 696, 701 (11th Cir. 2020) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "An officer is entitled to qualified immunity where his actions would be objectively reasonable to a reasonable officer in the same situation." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 638–41 (2002)).

For qualified immunity to apply, the government official must first show that he or she was "acting within the scope of his or her discretionary authority." *Moore v. Pederson*, 806 F.3d 1036, 1042 (11th Cir. 2015) (en banc). The term "discretionary authority" "include[s] all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." *Id.* (alteration in original) (quoting *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994)).[5] Once the government official establishes that they were acting within the scope of their discretionary authority, the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate. *Id.* To satisfy this burden, the plaintiff must show that (1) the facts demonstrate that the officer's conduct violated a constitutional right, and (2) the right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S 223, 232 (2009). The Court may consider the two prongs in any order, but "an official is entitled to

---

[5] Plaintiff concedes Defendants were acting within the scope of their official duties "at all relevant times." FAC ¶¶ 18–19.

qualified immunity if the plaintiff fails to establish either." *Piazza v. Jefferson Cnty.*, 923 F.3d 947, 951 (11th Cir. 2019).

## III.   DISCUSSION

Defendants argue that each of Counts I–III are barred by qualified immunity, because "the Detectives did not violate any law that was clearly established in 1990." Defs.' Mot. at 10.[6] Plaintiff argues that the undisputed material facts establish Defendants violated Plaintiff's due process rights and summary judgment should be granted as to Count I. *See generally* Pltff.'s Mot. Plaintiff also argues that Defendants are not entitled to qualified immunity as to any of Counts I–III. *See generally id.*; Pltff.'s Resp. Defendants' objections to Plaintiff's Motion are substantively the same as their arguments in favor of Defendants' Motion. *See generally* Defs.' Resp. The Court next addresses each Count in turn, and further details the Parties' arguments as to each.

### A.  Count I

Count I concerns Plaintiff's allegation that Defendants violated his rights to due process under the Fourteenth Amendment by using unduly suggestive identification procedures. FAC ¶¶ 220–37. "Determining whether an identification is so unreliable as to violate due process requires us to answer two questions: (1) whether the original identification procedure was unduly suggestive; and if so, (2) whether the procedure, given the totality of the circumstances, created a substantial risk of misidentification at trial." *Marsden v. Moore*, 847 F.2d 1536, 1545 (11th Cir. 1988).

---

[6] Defendants also argue that, at minimum, the record clearly establishes Detective McCully was "only minimally involved in the investigation, committed no constitutional violation of his own, and owed no clearly established duty to stop [Detective] Conley from committing a violation." Defs.' Mot. at 34. The Court need not address this argument in the alternative, as it resolves summary judgment in Defendants' favor in the first instance.

Defendants argue they are entitled to qualified immunity because Plaintiff inappropriately attempts to reraise already-defeated claims for inadequate investigation; Defendants' photo array presentations were constitutional and did not violate a clearly established law at the time; photo admonitions are like *Miranda* warnings, in that failing to provide them does not necessarily confer a right to sue under § 1983; and Defendants are not the proximate cause of Plaintiff's damages. Defs.' Mot. at 11–20.   Plaintiff argues he is entitled to summary judgment on Count I, because Defendants' photo identification procedures were unduly suggestive (particularly in how the array was constructed and in how it was presented); the identifications actually produced were unreliable; and these identifications proximately caused Plaintiff's wrongful conviction and 32-year imprisonment. *See* Pltff.'s Mot. at 4–12.

Defendants' Response to Plaintiff's Motion contains substantively the same arguments as Defendants' Motion. Defs.' Resp.  Plaintiff's Response to Defendants' Motion is similarly based largely in similar arguments as Plaintiff's Motion, but also emphasizes that Defendants' procedures violated his clearly established constitutional rights. Pltff.'s Resp. at 11.  Because the responses contain largely the same arguments as the Motions do, the Court will discuss them together.

"The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.  The Supreme Court has also "stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *D.C. v. Wesby*, 583 U.S. 48, 63–64 (2018) (internal quotations omitted).  The question "whether the violative nature

10

of particular conduct is clearly established" must be answered "in light of the specific context of the case, not as a broad general proposition." *Crocker v. Beatty*, 995 F.3d 1232, 1241 (11th Cir. 2021) (cleaned up). The Court will therefore analyze each aspect of challenged conduct in turn. It will first look at whether there was a "clearly established" constitutional right involving that conduct, and then, if necessary, to whether the right was violated at all.[7]

      *i.*      *The construction of the photo array*

Plaintiff argues that the construction of the photo array at issue itself violated his due process rights. His argument proceeds in two parts, and the Court will handle them separately. First, Plaintiff argues that the fillers in Plaintiff's photo array did not resemble Ms. Walton's description of the assailants. Pltff.'s Mot. at 4–5. Defendants argue that binding authority at the time Detective Conley constructed the photo array supports the constitutionality of the photo array as constructed. Defs.' Resp. at 10.

"The first step in assessing the constitutionality of [Defendants'] actions is to determine the relevant facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007). Here, the undisputed facts show that Ms. Walton described the suspect as a Black male in his late twenties to early thirties, who was close to two hundred pounds, but "wasn't fat." (ECF No. 185-8) at 1–4; Defs.' Stmt. ¶ 26; Pltff.'s Resp. Stmt. ¶ 26. She also described him as wearing a white, off-white, or beige, button-down sweater. Defs.' Stmt. ¶ 26. Plaintiff argues that he was the only person in the array shown to Ms. Walton and Mr. Miller that matched this description, and that Defendants violated his due process rights by including fillers that did not match this description. Pltff.'s Mot. at 4–5.

---

[7] Because the Court decides as to Count I based on the qualified immunity question, it does not reach Defendants' contentions regarding causation or arguing that failures to give proper admonitions during a photo lineup do not give rise to § 1983 claims. *See* Defs.' Mot. at 17–20.

Specifically, Plaintiff argues he was the only one in the array with a round face,[8] the only one wearing a white shirt, and "the heaviest looking person in the array." *Id.* at 4. Defendants argue "[t]here is simply nothing about Plaintiff's photograph that makes it jump off the page as being the only one consistent with Dorothy Walton's description." Defs.' Reply at 8.

Plaintiff argues it was clearly established in 1990 that suggestive photo lineups violate a suspect's rights. Pltff.'s Reply at 18–19. A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotations omitted). "The usual way of establishing that a constitutional violation was clearly established law is by pointing to a case, in existence at the time, in which the Supreme Court or [the Eleventh Circuit] found a violation based on materially similar facts." *Cantu v. City of Dothan, Ala.*, 974 F.3d 1217, 1232 (11th Cir. 2020). However, "courts must not define clearly established law at a high level of generality." *Wesby*, 583 U.S. at 63–64. Therefore, the relevant inquiry is whether it was clearly established in 1990 that photo arrays like the one Defendants arranged here are unlawful. In particular, the Court notes that while controlling law in 1990 did not need to condemn this exact factual scenario, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Creighton*, 483 U.S. at 640.

The Court finds that Defendants are entitled to qualified immunity for their construction of the photo arrays. In 1990, it was clearly established that it is unconstitutionally heightening the risk of misidentification to show a victim a photo array where one suspect is emphasized. *Simmons v. United States*, 390 U.S. 377, 383 (1968); *Foster v. California*, 394 U.S. 440, 443 (1969)

---

[8] Defendants argue that Ms. Walton never actually told Detective Conley "that the suspect had a 'round face.'" Defs.' Resp. at 7 n.2. Ms. Walton did, however, identify the suspect as having a "round face," according to a report from the night of the murder. (ECF No. 187-3) at 3.

(condemning lineup procedure where "[i]n effect, the police repeatedly said to the witness, 'This is the man'").  However, the Court finds that Defendants were not on notice that the particular array they compiled here violated the constitution.[9]  Controlling precedent at the time found significantly more suggestive photo spreads to be lawful.  *See, e.g.*, *United States v. Ricks*, 817 F.2d 692, 697 (11th Cir. 1987) (finding that a photo spread of males, all the same race, where only suspect wore eyeglasses was not unlawful); *Cikora v. Dugger*, 840 F.2d 893, 897 (11th Cir. 1988); *Williams v. Weldon*, 826 F.2d 1018, 1021 (11th Cir. 1987) (upholding pretrial identification where suspect was only Black man in lineup).  In *Ricks*, the crime at issue involved a bank robbery where a suspect wore sunglasses, and then only one member of the photo array had eyeglasses on.  *See* 817 F.2d at 698.  The court still found this procedure to not be unlawfully suggestive, and found that when the same witness identified the suspect again at trial four months later, "it is highly unlikely that the witness's selection of [the suspect] from the photo spread caused a mistaken identification." *Id.*  Similarly, here, Plaintiff's image in the photo array is the only one where the suspect is visibly wearing a light-colored shirt.  (ECF No. 187-24).  However, Ms. Walton went on to identify Plaintiff again at trial, Defs.' Stmt. ¶ 134, making it "highly unlikely" that the photo array's construction is what caused her mistaken identification.  *See Ricks*, 817 F.2d at 698.

In *Cikora*, the witnesses had described that the suspect was a white male with no facial hair.  840 F.2d at 894.  Yet, the court found the district court had not erred in finding that a photo array that included at least three mug shots, three Hispanic men, and where all of the men had facial hair, with the suspect's being sparse, was not impermissibly suggestive.  *Id.*  Given the controlling law in 1990, particularly *Cikora* and *Ricks*, the Court finds it was not "sufficiently clear

---

[9] The Court presumes *arguendo* that some constitutional right has been violated when evaluating the "clearly established" prong of qualified immunity.

that [Defendants] would understand that what [they are] doing violates" the law.  *Creighton*, 483 U.S. at 640.  Therefore, Defendants are not liable for their construction of the photo array, and are entitled to qualified immunity.

Plaintiff next argues that Defendants' inclusion of him in a photo array to begin with violated his due process rights, because law enforcement had received a tip specifically indicating the Tommy James involved with the murder was "from the Grove," but they knew the Tommy James from the Grove was in jail the night of the murder, so they "knew, or reasonably should have known" that there was no Tommy James involved with the murder.  Pltff.'s Mot. at 4; Pltff's Reply at 6–7.  Defendants argue that, in as much as Plaintiff critiques them for using his photo in the array at all, Plaintiff is repackaging a theory of liability for inadequate investigation that this Court already considered and rejected at the motion to dismiss stage.  Defs.' Mot. at 12 (citing (ECF No. 38) at 13–14).

The Court agrees with Defendants that the crux of Plaintiff's argument on this point "seems to be that [Detective] Conley should have known that no one named Tommy James was involved in the Francis McKinnon murder."  Defs.' Resp. at 4.  Plaintiff seeks to hold Defendants liable for not following this exact line of reasoning:  that the most important tip officers received is not all of the ones referring to Tommy/Thomas James, but specifically the one referring to a Tommy James from the Grove; that this tipster was referring specifically to the Tommy James that Plaintiff is referring to; that because this Tommy James, who was from Coconut Grove, was in jail the night of the murder, he did not commit the murder; and that, because he did not commit the murder, no Thomas James was involved in the murder at all.  While the Court finds this line of reasoning questionable and circular, it need not comment on its veracity, or whether Defendants knew about this other Thomas James, to find for Defendants here.  That is because the Court finds Plaintiff is

attempting to hold Defendants liable for an inadequate investigation, where they did not connect the dots that tipsters must have been mistaken in alleging Tommy/Thomas James was involved in the murder, because the man the tipsters were alleging was connected was actually in jail.  As the Court found at the motion to dismiss stage, "the right to be free from an inadequate investigation was not clearly established at the time Defendants conducted the allegedly inadequate investigation in 1990."  (ECF No. 38) at 14; *Aguirre v. Seminole Cnty.*, 158 F.4th 1276, 1309 (11th Cir. 2025) ("That right [to an investigation that pursued all exculpatory leads, without any evidence that officers actually harbored significant doubts] was not clearly established at the time of Hemmert and Grossi's investigation in 2004.").  Accordingly, the Court finds Defendants are entitled to qualified immunity on Plaintiff's arguments related to the construction of the photo array.

> ii.     *The presentation of the photo array to the witnesses*

Next, Plaintiff argues that Defendants' failure to follow proper procedures while presenting the photo lineup to Ms. Walton and Mr. Miller violated Plaintiff's due process rights.  Pltff.'s Mot. at 5–9.

Here, the Court begins again with the relevant, undisputed facts.  *Scott*, 550 U.S. at 378. Defendants presented two six-photo arrays to witnesses, most notably including Ms. Walton and Mr. Miller.  Defs.' Stmt. ¶¶ 56, 66.  The photo arrays had Photo Array Guidelines affixed to their backside.  *Id.* ¶ 52.  When showing Ms. Walton the arrays, Detective Conley did not read her admonitions contained in the Photo Array Guidelines.  *Id.* ¶ 57.  Instead of instructing Ms. Walton that the photo arrays may or may not contain a picture of the person being investigated, that she should not tell others whether she identified anyone, and that she should give him the reasons why she chose the photo she did, Detective Conley testified that he simply asked Ms. Walton, "Do you

recognize[] anyone?"  Pltff.'s Stmt. ¶¶ 39–40.  Ms. Walton then identified Plaintiff, and signed and dated the back of his photograph in the array.  *Id.* ¶¶ 42, 45.  When showing the photo arrays to Mr. Miller, Detective Conley again did not read him the same admonitions from the Photo Array Guidelines.  *Id.* ¶ 50.  Instead, he presented Mr. Miller the lineup after asking, "[D]o you recognize[] anyone?"  *Id.* ¶ 51.  Mr. Miller then identified Plaintiff in the photo lineup as the man who had asked him for a cigarette on the night of the murder, and Mr. Miller signed the same photograph that Ms. Walton had signed.  *Id.* ¶¶ 52, 54.  He later told Ms. Walton that he had picked the same picture as her in the photo lineup.  *Id.* ¶ 55.  Detective Conley told Mr. Miller he had made the right choice, but it is disputed if this happened right away or at some point in the near future.  *Id.* ¶ 53; Defs.' Resp. Stmt. ¶ 53.

Plaintiff specifically argues that Detective Conley "did not provide the required admonitions, did not tell the witnesses not to consult with each other, and did not record contemporaneous comments and confidence level."  Pltff.'s Mot. at 6.  Plaintiff's expert argues that these failures created a suggestive identification process.  *Id.* at 7–8 (citations omitted).  Defendants argue that Plaintiff's failure to cite controlling law showing the alleged constitutional violation was clearly established as such in 1990 "is reason enough for the Court to deny his request for summary judgment."  Defs.' Resp. at 15–16.  Defendants also assert they are entitled to summary judgment, and they affirmatively argue there was no clearly established right in 1990 to a lineup procedure that followed departmental guidelines.  Defs.' Mot. at 17.  Further, Defendants assert the clearly established law at the time showed that lineup procedures far more suggestive than the one at issue here were lawful.  *Id.*; Defs.' Resp. at 14–15.

The Court finds Defendants are entitled to qualified immunity for the manner in which Defendants presented the photo arrays to Ms. Walton and Mr. Miller.  As with Plaintiff's

Case 1:23-cv-24467-KMM   Document 215   Entered on FLSD Docket 02/03/2026   Page 17 of 28

arguments regarding the construction of the photo array, his arguments regarding its presentation are also foreclosed by the state of the law in 1990. For example, in *Cikora*, the officer presenting a photo array to witnesses told them, "[o]ne of the[] [men in the pictures] is believed to be the suspect." 840 F.2d at 894. The Eleventh Circuit nevertheless upheld the identification two of the witnesses made, finding the officer "did not direct the [witnesses'] attention to Cikora's photograph when he told them that one of the men pictured was the suspect." *Id.* at 896–97. Therefore, the controlling law at the time actually upheld a procedure where the officer was far more suggestive than Detective Conley was. This is true regardless of when Detective Conley told Mr. Miller he had made the right choice in selecting Plaintiff, as the Parties agree Detective Conley did not tell Mr. Miller until *after* he had made his choice. Pltff.'s Stmt. ¶ 53; Defs.' Resp. Stmt. ¶ 53.

Existing case law put Defendants on notice that the sorts of procedures that are unconstitutional are those that "made it all but inevitable that [witnesses] would identify" a certain suspect, with no indication that telling a witness he was right after the fact would be unconstitutional. *See Foster*, 394 U.S. at 443. As such, Defendants were not on notice that the procedures they employed could constitute a constitutional violation.[10] Accordingly, Defendants are entitled to qualified immunity as to Count I.[11]

---

[10] Plaintiff argues that the Court already rejected Defendants' argument, finding that the right against unduly suggestive identification procedures was already clearly established by 1990. Pltff.'s Reply at 17 (citing (ECF No. 38) at 7). The Court notes that while this right was clearly established on a general level, "courts must not define clearly established law at a high level of generality." *Wesby*, 583 U.S. at 63–64. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Creighton*, 483 U.S. at 640. Therefore, Plaintiff's Motion is denied, as he failed to point the Court to law that would have served to put Defendants on notice to this right.

[11] The Court also finds that Defendants' failure to follow the Photo Array Guidelines, whether mandated by the MDPD or not, does not in and of itself give rise to a constitutional violation. *Knight v. Jacobson*, 300 F.3d 1272, 1276 (11th Cir. 2002) ("Section 1983 does not create a remedy

## B.  Count II

Count II concerns Plaintiff's claim that Defendants should be held liable for instituting criminal charges without probable cause, thereby engaging in malicious prosecution and seizure in violation of the Fourth Amendment.  FAC ¶¶ 238–45.  The Eleventh Circuit treats malicious prosecution claims as requiring plaintiffs to prove both the common law elements of the tort and a violation of the Fourth Amendment.  *Butler v. Smith*, 85 F.4th 1102, 1111 (11th Cir. 2023).  "[T]o prove a Fourth Amendment malicious-prosecution claim in [the Eleventh] Circuit, a plaintiff must establish four elements:  (1) the plaintiff was seized under legal process; (2) the legal process justifying the plaintiff's seizure was constitutionally infirm; (3) the suit or proceeding terminated in the plaintiff's favor; and (4) the seizure would not otherwise be justified without legal process."  *Gervin v. Florence*, 139 F.4th 1236, 1248 (11th Cir. 2025); *Laskar v. Hurd*, 972 F.3d 1278, 1284 (11th Cir. 2020) (explaining plaintiffs must show officials instituted criminal process "with malice and *without probable cause*" (emphasis added)).  In the qualified immunity context, courts in the Eleventh Circuit are instructed to "review for 'arguable' probable cause," which is a lower standard than probable cause and "asks whether a reasonable officer[] in the same circumstances and possessing the same knowledge as the Defendant[] could have believed that probable cause existed."  *Aguirre*, 158 F.4th at 1301 (alterations in original) (quoting *Butler*, 85 F.4th at 1116).

In analyzing Count II, the Court begins again with the relevant, undisputed facts.  *Scott*, 550 U.S. at 378.  On June 13, 1990, Detective Conley met with ASA Kathleen Hoague, who

---

for every wrong committed under the color of state law, but only for those that deprive a plaintiff of a federal right."); *see also Davis v. Scherer*, 468 U.S. 183, 194 (1984) ("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision."); *Knight through Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 813 (11th Cir. 2017) ("[M]any police departments have internal procedures that are more restrictive of conduct than what is otherwise permitted under state and federal law.").

approved his decision to seek a warrant based on the information he provided within his affidavit. Pltff.'s Resp. Stmt. ¶ 77.  In his affidavit, Detective Conley shared that a witness "inside the apartment" when the shooting occurred identified Plaintiff as the murderer.  (ECF No. 185-14) at 2.  He also indicated that a witness observed Plaintiff "standing in the hallway near the victim's apartment" shortly before the assailants entered Francis McKinnon's apartment and killed him. *Id.*  Plaintiff was arrested on July 19, 1990.  Defs.' Stmt. ¶ 79.  Another ASA, Rose Marie Antonacci-Pollock was assigned to the case and prepared to present the case to a grand jury.  *Id.* ¶ 81.  In the process of preparing to present the case, she conducted sworn interviews with Ms. Walton and Detective Conley.  *Id.* ¶¶ 83–86.  Detective Conley told ASA Antonacci-Pollock about anonymous tips referring to "Dog" and "Thomas James" as suspects.  *Id.* ¶ 84.  By the time ASA Antonacci-Pollock presented her case to the grand jury, she would have "had some … background information about what happened."  *Id.* ¶ 90.  The grand jury indicted Plaintiff on charges of first-degree murder, burglary, robbery, and aggravated assault  *Id.* ¶ 91.

Defendants argue they are entitled to qualified immunity as to Count II because the arrest warrant and subsequent grand jury indictment establish that there was probable cause for Plaintiff's arrest and, at the very least, arguable probable cause supported Plaintiff's seizure.  Defs.' Mot. at 20–26.  Plaintiff argues that Detective Conley omitted information from his affidavit in support of Plaintiff's arrest warrant, and that this information "undermined the trustworthiness of Dorothy Walton's identification," leaving "a dispute for the jury on whether there was probable cause to pursue charges against [Plaintiff]."  Pltff.'s Resp. at 16–19.  Plaintiff further argues that the question of whether these omissions were reckless is for the jury.  *Id.* at 20–21.  Finally, Plaintiff argues that the indictment does not protect Defendants from liability because Detective Conley "recklessly concealed material exculpatory evidence from the State's Attorney who, even in the

absence of such exculpatory evidence, believed the case against [Plaintiff] was very weak." *Id.* at 22.

Defendants are entitled to qualified immunity as to Count II, because there was at least arguable probable cause that justified arresting Plaintiff. This is true even when curing Detective Conley's affidavit of alleged misstatements and omissions. *See Aguirre*, 158 F.4th at 1305 (evaluating qualified immunity arguments after curing affidavit of alleged misstatements and omissions). Plaintiff argues that the following details were each omitted from Detective Conley's affidavit that led to the issuance of an arrest warrant: (1) Ms. Walton was less likely to accurately identify the shooter given the circumstances; (2) witnesses consistently identified the shooter as being a Black man wearing a hat and white T-shirt, which matched other witnesses' description of Vincent Williams; (3) Ms. Walton and her husband had each previously identified another person; and (4) Vincent Williams had multiple arrests and convictions for armed robberies prior to the murder, whereas Plaintiff did not. Pltff.'s Resp. at 16–17.

When considering this information as true, the Court still finds there was at least arguable probable cause to arrest Plaintiff. As for the evidence pointing to Vincent Williams, or even the Tommy James from the Grove, "the suggestion of an alternative suspect does not, on its own, vitiate probable cause." *Aguirre*, 158 F.4th at 1307–08 (noting "probable cause can exist for multiple suspects simultaneously"). This is especially true in this case, where the crime involved two assailants. Further, even when accounting for Plaintiff's argument that Ms. Walton's identification was less likely to be accurate given the circumstances,[12] a reasonable officer could still take a suspect identification from an eyewitness as establishing probable cause that Plaintiff

---

[12] Plaintiff details these circumstances, including Ms. Walton's "heightened stress," her "focus on her purse while it was being rifled by the person holding the gun," and "the sudden disappearance of both perpetrators." Pltff.'s Resp. Stmt. ¶¶ 224–30.

was the shooter.  *See Scott v. City of Miami*, 139 F.4th 1267, 1274 (11th Cir. 2025) ("In general, reliance upon eyewitness testimony, including that of a victim of a crime, is sufficient to establish probable cause."); *see also Aguirre*, 158 F.4th at 1301.  In as much as Plaintiff argues these circumstances must be evaluated by a jury, the Court finds that probable cause is "a pure question of law." *Swint v. City of Wadley, Ala.*, 51 F.3d 988, 996 (11th Cir. 1995); *Aguirre*, 151 F.4th at 1292.  Further, a reasonable officer could also still lend enough credence to Ms. Walton's identification, even if she had previously identified someone else,[13] to believe probable cause existed.  *See Mills v. Town of Davie*, 48 F. Supp. 2d 1378, 1380–81 (S.D. Fla. 1999).  Therefore, there was at least arguable probable cause justifying the seizure of Plaintiff.

Therefore, the Court finds Defendants are entitled to qualified immunity as to Count II.[14]

## C.  Count III

Count III concerns Plaintiff's allegation that Defendants deprived him of liberty and denied him fair criminal process in violation of the due process clause of the Fourteenth Amendment by concealing exculpatory and impeachment evidence.  FAC ¶¶ 246–86.  Defendants in criminal cases or habeas proceedings establish violations for nondisclosure under *Brady v. Maryland*, 373 U.S. 83 (1963), by showing "favorable evidence material to [their cases] was not disclosed to the defense." *Porter v. White*, 483 F.3d 1294, 1305 (11th Cir. 2007); *United States v. Bagley*, 473 U.S. 667, 682 (1985) (explaining evidence is material where there is "reasonable probability that,

---

[13] Defendants do not concede this is true.  Defs.' Mot. at 27–28.  This is not a "material" fact for summary judgment purposes, as its truth does not impact the outcome.  *Anderson*, 477 U.S. at 248.

[14] Because there was arguable probable cause supporting Plaintiff's seizure even when omitting all alleged misstatements, the Court does not reach whether Defendants' misstatements were intentional or reckless.  *Paez v. Mulvey*, 915 F.3d 1276, 1287 (11th Cir. 2019).  The Court also does not reach whether the grand jury indictment and arrest warrant are sufficient to establish probable cause.  When courts find there was arguable probable cause for an arrest, defendants are entitled to qualified immunity as to malicious prosecution claims.  *Aguirre*, 158 F.4th at 1308.

had the evidence been disclosed to the defense, the result of the proceeding would have been different"). *Brady* duties are "imposed on the prosecutor," but law enforcement officials have a "correlative duty . . . to turn over exculpatory evidence to the prosecution." *Porter*, 483 F.3d at 1306. In § 1983 actions like this one, plaintiffs must also show something more than negligence on the part of the defendants, as "a negligent act or omission cannot provide a basis for liability in a § 1983 action." *Id.* at 1308.

In analyzing Count III, the Court begins again with the relevant, undisputed facts. *Scott*, 550 U.S. at 378. Shortly after the shooting, Defendants learned that a man known as "Dog" was seen running behind a building. Pltff.'s Stmt. ¶ 20. They also received information that suggested a man named "Thomas James" or "Tommy James" was a suspect. *Id.* ¶¶ 21–22. One 911 caller said that the assailants were Vincent "Dog" Williams and Tommy James "from the Grove." Pltff.'s Resp. Stmt. ¶ 22. Ethra McKinnon, Dorothy Walton, and John Walton were each shown a photo array the night of the murder. Defs.' Stmt. ¶¶ 24, 32. Detective Conley reported none of the witnesses were able to make an identification when shown this array on the night of the murder, which featured fillers and a man known as "Dog," although he was not Vincent Williams, the "Dog" that was later considered a suspect in the case. *Id.* ¶¶ 33–35. Detective Conley testified that he destroyed fieldnotes he had taken during this process, but had included anything pertinent that could be found in the notes in his report. *Id.* ¶¶ 186–88. However, Detective Conley's homicide file actually included fieldnotes from that night. *Id.* ¶ 188; Pltff.'s Resp. Stmt. ¶ 188. When Detective Conley compiled the subsequent photo array that included Plaintiff, he did so using reports created by the MDPD records department of all potentially relevant local men named Thomas James. Defs.' Stmt. ¶¶ 42–43. One of these reports included Plaintiff, as well as Tommy

James from the Grove; however, the latter was in jail the night of the murder.  Pltff.'s Stmt. ¶¶ 24–27.

Defendants argue they are entitled to qualified immunity as to Count III because Detective Conley's field notes would be inadmissible at trial and it is impermissibly speculative to try to make sense of his handwriting and shortform; failing to locate and interview another suspect did not constitute the withholding of exculpatory evidence; and, in any case, there is no indication that any evidence was *intentionally* withheld.  Defs.' Mot. at 26–34.  Plaintiff argues that Defendants are not owed qualified immunity, because they did not provide the prosecution with the following exculpatory evidence:  Detective Conley's handwritten notes, which include notes about the photo array shown to witnesses the night of the murder; evidence that Tommy James from the Grove was in jail at the time of the murder; information regarding the whereabouts of Vincent Williams; and information regarding Vincent Williams' criminal history.  Pltff.'s Resp. at 23–32.  Plaintiff further argues that if this evidence had been revealed, there is a reasonable probability that "its disclosure would have produced a different result."  *Id.* at 32–34.  Finally, Plaintiff argues Defendants' conduct was at least grossly negligent or reckless, and that this is enough to meet the Eleventh Circuit's standard for liability in such cases.  *Id.* at 34–36.

The Court will address each piece of potential exculpatory/impeachment evidence.  The Court finds that Defendants did not have exculpatory evidence regarding the other Tommy James, and finds that whatever evidence they might have had was not withheld.  Plaintiff argues that Defendants knew and concealed the Tommy/Thomas James that tipsters referred to was a specific Tommy James from the Grove, and that this Tommy James was in jail.  Pltff.'s Resp. at 24–27.  As explained above, the Court does not find Plaintiff's attenuated argumentation regarding the other Tommy James to be compelling.  The Court agrees with Defendants that the record evidence

supports only that Detective Conley "knew one of the suspect's names was rumored to be 'Thomas James,' which is Plaintiff's name." Defs.' Reply at 16. The Court also agrees with Defendants that there is no evidence Defendants had reason to believe that the Tommy James in jail was the one "most likely to have been Vincent Williams' accomplice." Defs.' Mot. at 31. Plaintiff argues that Defendants were on notice that the Tommy James tipsters referred to was from the Grove, based on an anonymous tip to the Coral Gables Police Department communications desk. Pltff.'s Resp. at 26. However, Defendants correctly note that the prosecutor and defense attorney in Plaintiff's original case were both aware of this anonymous call and its contents. Defs.' Reply at 16–18. Therefore, the evidence regarding the other Tommy James, who was from the Grove, is not exculpatory and also was not withheld, as Defendants meet their legal duty if they provide exculpatory evidence to the prosecutor. *See Polk v. Nugent*, 554 F. App'x 795, 799 (11th Cir. 2014); *Porter*, 483 F.3d at 1306.

The Court finds that the evidence regarding Vincent Williams' whereabouts and his criminal history do not give rise to *Brady* violations. As for the evidence regarding Vincent Williams' various prior convictions, Plaintiff argues that if such evidence had been made available to the jury, it could reasonably conclude he was responsible for killing Francis McKinnon. Pltff.'s Resp. at 32. The Court finds, however, that evidence of Vincent Williams' criminal history was a matter of public record and therefore, not *Brady* material. *See United States v. Barroso*, 719 F. App'x 936, 941 (11th Cir. 2018). Next, Plaintiff argues that Detective Conley was withholding information from the prosecutor when he said he "had been unable to find" Williams, as Williams was in and out of custody throughout 1990, including being arrested by the MDPD itself. *See* Pltff.'s Resp. at 31. This too, however, is premised upon information of public record, which Defendants did not have a duty to disclose. *See Barroso*, 719 F. App'x at 941. In as much as

Plaintiff argues that Detective Conley was intentionally attempting to conceal this evidence, the Court finds there is no evidence he attempted to conceal Williams' whereabouts. *See Polk*, 554 F. App'x at 799; *see also Celotex*, 477 U.S. at 325 (explaining that moving party at summary judgment meets its burden by showing "there is an absence of evidence to support the nonmoving party's case"). Therefore, the Court finds the information regarding Vincent Williams did not give rise to potential *Brady* violations.

This leaves only Detective Conley's fieldnotes for the Court to consider. The Court finds a reasonable officer would not have considered the information regarding the photo array shown on the night of the murder to be material. *McMillian v. Johnson*, 88 F.3d 1554, 1569 (11th Cir. 1996) ("For if a reasonable officer would not know that the exculpatory and impeachment evidence was material, he would not know that 'what he is doing' violates federal law." (citation omitted)). Even accepting Plaintiff's interpretation of Detective Conley's fieldnotes as true, that would indicate that Ms. Walton had said "maybe 1" when shown a photo array the night of the murder. Pltff.'s Resp. at 27. A reasonable officer would not necessarily consider this to be material.

The Court finds the reasoning in *Fappiano v. City of New York*, as invoked by Defendants, Defs.' Reply at 19, to be instructive here. *See generally* No. 01-CV-2476, 2015 WL 94190 (E.D.N.Y. Jan. 7, 2015). In *Fappiano*, the court found no *Brady* violation where officers had not disclosed to prosecutors that, on the night of the crime, the victim said someone other than the criminal defendant resembled her attacker in a lineup that did not include that criminal defendant. *Id.* at *15. The court explained that, because there was no clear identification of another person, the victim's statement "had no exculpatory value for the defense." *Id.* (collecting cases). The court also explained the eventual strength of the victim's in-court identification rendered this evidence immaterial even as impeachment evidence, where the victim said in court that she was

"absolutely positive" the criminal defendant was the suspect, and where she testified she would "never" forget his face. *Id.* at *16.

Similarly here, Ms. Walton's apparent statement was that someone other than Plaintiff was "maybe" the suspect in question. Pltff.'s Resp. at 27. This identification, like the one in *Fappiano*, happened on the night of the crime in question, and would "at best, impeach[] her recollection of the minute details of the early investigation." 2015 WL 94190, at *16. Further, although ultimately retracted years later, Ms. Walton's in-court identification was extremely strong, as she said: "I'm positive of it. I will never forget his face. I will never forget his eyes." (ECF No.185-27) at 310. Thus, the Court finds that notes regarding Ms. Walton's tentative identification of someone other than Plaintiff on the night of the murder are not material,[15] as they have no exculpatory and "minimal impeachment value."[16] *Fappiano*, 2015 WL 94190, at *16.

Further, in 1990, it was only clearly established law that officers could not *intentionally* withhold material evidence from prosecutors. *Porter*, 483 F.3d at 1304 n.5, 1306 (explaining that caselaw even as late as 2007 only told officers they "had a duty not to intentionally withhold exculpatory evidence from the prosecution"). Detective Conley testified at the time that he had

---

[15] The Court is aware that the materiality of withheld exculpatory or impeachment evidence is to be considered cumulatively for the purposes of *Brady*. *Kyles v. Whitley*, 514 U.S. 419, 421 (1995). However, the Court has already held the other allegedly withheld evidence does not violate *Brady* for reasons other than its material effect, so they need not be considered for materiality purposes.

[16] In as much as Plaintiff argues that Detective Conley could have himself had his testimony impeached using these notes, the Court finds that argument unavailing. *See May v. Hoke*, 711 F. Supp. 703, 712 (E.D.N.Y. 1988), *aff'd*, 875 F.2d 857 (2d Cir. 1989) (finding no reasonable probability that collateral impeachment of an investigating police officer would have changed the verdict); *see also* Pltff.'s Stmt. ¶ 65 ("The only evidence of guilt introduced by the State at [Plaintiff's] trial was Dorothy Walton's pretrial and in-court identification of [Plaintiff] and Larry Miller's pretrial identification of a photo of [Plaintiff].""). The Court also rejects Plaintiff's arguments regarding Detective Conley's notes about Mr. Walton, as the record indicates Plaintiff's attorney at his criminal trial was aware Mr. Walton had tentatively identified someone other than Plaintiff when shown his photo array. *See* Pltff.'s Reply at 20 n.9.

destroyed his fieldnotes.  Defs.' Stmt. ¶ 187.  The Court finds that, given that he had every opportunity to do just that and conceal the information therein, Detective Conley's misstatement was negligent and his actions "do[] not support a finding of bad faith."  *See Mitchell v. Goldsmith*, 878 F.2d 319, 322–23 (9th Cir. 1989).  The Court also finds that Plaintiff has failed to meet his burden of providing evidence that Detective Conley acted intentionally by not turning over his handwritten fieldnotes. *See Celotex*, 477 U.S. at 325.

Therefore, the Court finds Defendants are entitled to qualified immunity as to Count III.

## IV.    CONCLUSION

Accordingly, UPON CONSIDERATION of the Motions, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED as follows:

1.  Plaintiff's Motion for Partial Summary Judgment (ECF No. 188) is DENIED.

2.  Defendants' Motion for Summary Judgment (ECF No. 186) is GRANTED.

3.  Defendants Detective Kevin Conley and Detective Charles McCully are hereby TERMINATED from this case.

4.  The stay is hereby LIFTED.

5.  The final pretrial conference, calendar call, and trial are continued as follows: trial is now scheduled for April 20, 2026; the calendar call is now scheduled for April 16, 2026; and the final pretrial conference is now scheduled for April 7, 2026.

6.  Plaintiff and Defendant Miami-Dade County are DIRECTED to file a joint status report on or before February 10, 2026, indicating each of the following: whether they intend to proceed with this matter; what the impact of the stay was

on Defendant Miami-Dade County's deadline to respond to Plaintiff's Fifth Amended Complaint; what matters are left to resolve after this Order; whether the Parties believe further discovery is required; and whether they intend to engage in further motion practice.

DONE AND ORDERED in Chambers at Miami, Florida, this __3rd__ day of February 2026.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc: All counsel of record