# INFORMANTS

Investigation of criminal offenses must penetrate the veil of secrecy behind which most crimes are committed. Carried out in ways that afford the most concealment, criminal acts generally offer little in the way of tangible leads for investigators. By the time you reach the crime scene, the suspect has probably disappeared. Your training tells you to draw upon several sources. You examine physical evidence during the course of the investigation, but by itself, the physical evidence you gather often does not identify the perpetrator. Frequently, physical evidence will only place the suspect at the crime scene once he has been brought under suspicion. People are another source, and probably the most important one, that you will draw upon during your inquiry. Thus, the informant may be a valuable investigative source in addition to the victim, witnesses, and the like. He is the most direct and fastest contact with criminal elements. He may provide information in a few minutes that would otherwise require an extensive investigation to uncover.

To be a proficient investigator, you must possess a variety of sources of information. Failure to employ all possible sources of information may easily result in a lot of wasted time on your part, and perhaps an unsuccessful conclusion to the case. Many police officers are reluctant to use informants because the public attitude seems to imply that their use is somehow unfair. This antagonism toward informants emphasizes that all of us tend to look for neat categories into which the people we deal with can be placed. The police officer who employs an informant to solve a heinous crime, or to destroy a narcotic ring, and the like, doesn't appear to fit the popular image of a hard working, scientifically equipped master sleuth intuitively fitting together the seemingly unconnected pieces of the case. Of course, the point is that the case is successfully cleared, and probably more efficiently.

Sometimes the informant is considered to be a secret police agent, a person who will infringe upon the individual liberties of citizens. There is usually a feeling of apprehension on the part of the informant that the act of communicating information about the criminal acts of others is somehow immoral, if not personally dangerous. In spite of the attitude of most persons of scorn toward informants, their use is a basic investigative technique in law enforcement.

*This Training Key will discuss the value of informants in law enforcement. Special emphasis is placed on control, treatment, and records as they pertain to informants.*

## Possible Informants

*Man seeks social contact with others.* He is curious about those around him and notes conditions unfamiliar to him. Your feelings of suspicion are based on such observations. Many criminals have been apprehended because something just did not seem right to you. Men seek recognition for their deeds, and they are prone to pass on rumors about the deeds of others. This trait makes complete secrecy difficult. This also creates the situations in which, if cultivated properly, criminal exploits can come to light.

All people can be sources of information, and in the broad sense of the term, can be referred to as informants. Police officers usually exchange information with close friends, and to a degree with acquaintances and relatives, usually without actually soliciting it. You probably have established rapport with a number of reputable citizens who may be a helpful source of information. A short list of these would include newspaper boys, milkmen, automobile dealers, credit men, storekeepers, barbers, and doormen. There are other law-abiding citizens who generally cooperate with the police, but because of the nature of their work, you may find them a little closer to the criminal than the average person. This group would include bartenders, pool hall operators, pawn shop dealers, night club managers, and some newsstand vendors. Taxi drivers in certain areas are included in this group. (Although cab drivers are notorious traffic law violators in some places, an impartial traffic enforcement program will often win their respect and cooperation.) After establishing rapport with these people, you will be surprised at how bits of information they reveal can assist you when placed in the context of the investigation.

Your most valuable source of information is likely to be a person who is now or has been a part of the criminal group. This person is in a good position to reveal the details of a crime or about crimes being planned, partly because he is likely a criminal himself. He can provide significant bits of information that can help to develop an accurate picture of a criminal act.

Officers have on occasion erroneously developed the tendency to overlook the criminal deeds of a productive informer. *It is unethical for any police officer or agency to establish a protective allegiance with those who have complicity in a criminal act.* Distorted perspectives and faulty judgment may lead you to seek compromise with criminals; however, this only encourages the petty informant of today to become enmeshed in serious acts tomorrow. An informant status should never be viewed as a license for present or future misconduct.

During the selection process, give consideration to the informant's health, age, education, personality traits, employment and finances. Failure to consider the whole person can result in wasted expenditures of money and time. Verify new information through other reliable informants or in a controlled situation where the information is already known to you.

COMPOSITE EXHIBIT 1

## Motives of Informants

As noted, the use of criminal informants has been the object of public criticism, and questions have been raised on moral and ethical grounds. Too often, people believe that police officers condone and actually protect the criminal activity of an informant in return for his services. The informant is willing to furnish important information to you for one or more of a number of reasons, none of which involve protection. You have the responsibility to evaluate the informant and the information given in order to arrive at the truth. Thus, the motive is important, and an attempt to determine the motive should be made.

**Fear.** Some people may become informants because they are afraid of the law or of their criminal associates. Friends or relatives often inform in an effort to remove their loved one from a life of crime.

Some officers have found that at certain times they can, through fear, cause an individual to ferret out information. This fear will eventually lose its impact when other motivations supercede his fear, and there would be little hope of regaining his cooperation.

**Mercenary.** This type of informant provides the information for the sole purpose of financial gain. His interest is to sell what he knows for the highest price. The information obtained from him is generally good, as this is his business. However, he can be extremely dangerous. He may sell to a higher bidder or sabotage you by giving misleading information.

**Avoidance of punishment.** A person who is apprehended in the commission of a minor crime may seek to avoid prosecution by revealing information concerning a major crime.

**Revenge.** A person may retaliate against those who have taken advantage of him, or otherwise injured him. This person is acting on a grudge, and often times he may exaggerate or make a report that is completely erroneous. His motivation is to get even for a real or imagined wrong.

**Gratitude.** In this instance, the informant is willing to cooperate as an expression of appreciation for an officer's interest. Many valuable informants have been developed by an officer showing interest and perhaps care for the criminal and his family while he is in custody or by his assistance in other ways, such as helping him find employment upon his release. This not only establishes good rapport, but also often helps in his rehabilitation, which is the major reward. There are many informants who are assisting the police as an expression of gratitude for previous consideration and concern on the part of the officer.

**Gain.** A person who is incarcerated may wish to provide information in order to obtain a privilege, such as cigarettes.

**Competition.** This person is usually a criminal who wishes to eliminate competition by informing. By eliminating rivals, the informant can take over the action. Often false information is provided to divert suspicion from themselves or to attempt to gain information from the police.

**Reform Motive.** This person is repenting for a wrong he has committed and wishes to set the record straight—at least in his own mind.

**Demented.** A few people provide information because of a peculiar quirk in their personality. Generally such persons are more of a bother than they are of value. However, they should never be cut short; give them an opportunity to tell their story, and check it out. There always may be that one chance that the information they give you will make the big case.

These are just a few of the motives that may cause a person to pass on information. There are other motives which in combination with civic responsibility, a sense of personal importance, and a wide variety of psychological and sociological factors may condition a person to become a source of information.

## Management of the Informant

The allegations of unethical, immoral and possibly illegal arrangements between police and informants underline the need for effective police management of the informant. Additionally, it must be remembered that the individual officer is an agent of the department, and does not "own" the informant. Traditionally, it seems that the identity of an informant was known only by the individual investigator with whom he worked. If the officer happened to be assigned to other cases, or was no longer with the department, then the value of the informant was lost. The identity of the informant should be maintained in one central file. His identity must be kept confidential, and *complete security* of this file must be maintained. Only a few high-ranking officers should have access to this central file, and only on a need-to-know basis.

This file should contain all the information known about the informant. The dossier should contain the results of a *discreet inquiry* in regard to the informant's background, including his occupation, associates, income, and the like. His complete criminal record should be set forth. Pertinent background data, general attitude toward assisting the police, known personal idiosyncrasies, and suggested time and place of contacts, should be included. Within this file, a record of all transactions with the informant should be maintained, including a resume of cases worked on, the method of payment (if any) and an up-to-date evaluation of the informant's reliability. A constant effort must be made to keep the file current. This will help to insure that a valuable informer is not lost to the department.

The informant's name should never appear outside of the master file. He should be assigned a code name or number, and this should appear in all reports wherein reference to him is made. A cross reference file is useful, but it must be maintained with the same degree of security as the master file.

An "informant locator" file can be maintained apart from the master file and housed where access is available to all officers needing the information. This file should be indexed by different classifications such as associates, connections, operations, areas, and the like, of the informant. Thus, through the use of this locator file, if you need an informant and know one or more of the index classifications, you may search the file and determine if an informant is working in your field of inquiry. If you are able to locate an informant in the locator file (listed only by code name or number), then you can submit a request for contacting arrangements. In this way,

greater use is made of informants' knowledge without compromising identity.

If you know a person is informing for another officer, it is unwise to mention that fact to the informant in a casual encounter. *Security is the paramount consideration in the continued use of a person who is furnishing the information.* Don't become careless just because you feel you "know" your contact.

Expert handling and judgment is needed to preserve the integrity of the department. Mismanagement in connection with the informant may mean his death. The management program must be developed and operated so as to effect maximum use of the informant for the benefit of the entire agency. It must be strongly supervised and based upon legal and ethical proscriptions. An informant management program is meaningless if some departmental members compromise their integrity.

## Control

An individual member of the department and one alternate should be assigned to each informant. Ideally, the officer who first developed the informant should be assigned to him. All contacts with his informant should be made by the assigned officer, even when this is his only role in the case. In order to provide the investigating officer with first hand knowledge of the information, he should be present when the meeting is held. The alternate officer can become acquainted with the informant by accompanying him to occasional meetings. This alternate officer will facilitate the necessary contacts at some future time should the regularly assigned officer not be available.

The value of having one investigator call upon the informant is to avoid repetitive demands on the informant's time and to circumvent personality conflicts. One investigator making all of the contacts, being fully aware of the pitfalls he may encounter, will expeditiously and economically keep relations on an even keel, and will actually attain much more cooperation than could otherwise be gained. Friendship and mutual trust between the informant and the officer tend to develop naturally, but when no control is exercised, relations will grow thin each time an investigation is being conducted.

One of the principal responsibilities as a control officer is to evaluate the informant and estimate his reliability. The information received should be tested for consistency by checking against the information obtained from other sources. The motives and interests of the informant should always be considered in the evaluation.

**FEMALE INFORMANTS:** Women informants can often divulge valuable information; however, special precautions should be taken to protect the reputation of the informant, yourself and the department. The woman may be a reputable citizen or she may be a prostitute. In any case, it is incumbent upon you to keep to the goal of gathering information, and not consoling, and to avoid any false claims of misconduct. Generally, the primary motivation for a woman to become an informant is emotional.

**JUVENILE INFORMANT:** Juveniles have been placed by society in a category requiring special courts, records, detention centers, and the like. Special handling applies to juvenile informants. You must adhere strictly to the requirements of law and to your own common sense in seeing that juvenile officers, parents, or other appropriate persons are consulted so that there will be no opportunity for complaint that the juvenile was abused or taken advantage of.

**MEETINGS:** Don't become careless in contacting the informant. The selection of a meeting place, on each occasion, should be made by the control officer, and not by the informant. The location and times should vary with due consideration to both the officer's and the informant's normal routine.

There may be occasions when contacting the informant directly is undesirable. An unlisted telephone in the investigator's office is useful in this situation. When answering the telephone repeat the number—not "Police Department, Detective Jones speaking." Other methods of contacting the informant may also call for guarded or unguarded letter drops, or the mail. At times, in major operations, it may be desirable to establish such things as business or other cover activities. Always prepare an informant with a cover story in the event he is observed in the company of the control officer. The cover story should be simple and acceptable to any casual observer. Careful judgment in communicating will avoid revealing the status of the informant. The following points should be observed:

...The meetings should be held at a place other than your office.

...Plan your meetings so you will not create a recognizable pattern.

...The informant's identity should not be revealed in any communications.

...Avoid having your agency identified in any correspondence with the informant.

## Treatment of Informants

The treatment of the informant may be delicate because of the variety motivations present. Each informant will be different and your treatment of him must differ accordingly. However, certain rules are applicable.

Avoid the use of derogatory terms. You may be working with unscrupulous or despicable persons. And to you the label "informant" may conjure up many derogatory connotations, such as "stool pigeon," "traitor," "snitcher," "doublecrosser," "rat," "fink," and "squealer." It should be obvious that these terms have no place in the police-informant relationship. Any informal or formal use of such derogatory words will do nothing to help develop rapport.

One of the most compelling deterrents against informing is the hatred which can come from other people. Although you may have some similar feelings of your own, don't let your language reveal this attitude. Substitute a term like "source" or "special employee" or some other similar term.

Express appreciation by encouraging and complimenting the informant for all information received, regardless of its value. A conversation often starts out, "I don't know if this is worth anything, but . . ." only to turn out to be the information you were seeking. Encouragement should not be interpreted to permit an informant to take charge of any phase of the investigation, although some informants will try it, intentionally or not. You must keep what you know to yourself. Revealing information will establish your susceptibility to doublecross.

Make good all promises; make no promises that you cannot keep. You cannot promise the informant

that he will not go on trial for certain crimes. You can, however, make good your promise that you will notify the prosecuting attorney of his cooperation in aiding you. You must be scrupulous in the fulfillment of all promises which you have made. Any other policy will result in lack of trust and the loss of the informant, to say nothing of your own self-respect.

There are many guides to remember when dealing with an informant, such as keeping appointments on time, even though the informant may not appear. Don't become anxious; be patient with him. Investigate all leads. The fact that a previous tip was of no value after investigation should not cause you to automatically discount other tips. Be noncommital about the value of the information received. Consider all information from informants as valuable until proven otherwise.

## Courts and Informants

Generally, the court will treat the informant's information as hearsay and evaluate it for reliability. If you can establish that the hearsay information is reliable and credible, the court can accept it under certain conditions. In contrast, if the court is skeptical about the informant's reliability, it may reject the information. In the court's evaluation, two areas are examined. The court will look at the source of the information; if it is from reputable citizens, public officials or informants with a history of reliability, it will carry more weight than that from anonymous phone calls, known criminals or informants whose reliability is questioned or unknown. The court will also evaluate information in terms of the corroboration you made by comparing the specific allegations with the circumstances and events.

A guiding case that demonstrates conscientious efforts to corroborate information is found in *Draper v. United States, 358 U.S. 307 (1959)*.

A reliable informant identified the defendant to the officers by physical appearance (skin complexion, height, weight, size, sex), and dress (color and type of coat and hat), as well as what he would be carrying (black satchel with narcotics) and stated which train he would be on. The officers met the train and observed the defendant, exactly as described, get off the train. They placed Draper under arrest and recovered the narcotics in the black satchel.

The U.S. Supreme Court found that the events observed by the officers substantially corroborated the information. The Supreme Court held the arrest to be lawful and the search for narcotics incidental to arrest.

The Supreme Court in *McCray, 386 U.S. 1042 (1967)* strengthened the Draper ruling. Officers who make arrests based on information furnished by a reliable informant, and are able to establish his past reliability or independently corroborate the information, need not disclose the informant's identity and the arrest is valid.

Corroboration is essential in evaluating information. The Supreme Court held in *Aguilar v. Texas, 378 U.S. 108 (1964)*, that it is insufficient for the officer to simply tell the judge in his application for a search warrant that the informant has previously proved to be reliable or that the officer knows the informant is reliable. The affidavit is inadequate because underlying circumstances necessary to enable the magistrate to independently judge the validity of the information were not set forth, and secondly the officer did not attempt to support his claim that the informant was credible or his information reliable.

The Supreme Court held in *Spinelli v. United States, 89 S. Ct. 584 (1969)*, that when corroboration of the informant's tip does not provide more than mere suspicion that a crime was probably being committed, then the information is insufficient. Further, that a simple assertion of suspicion that Spinelli was a known gambler is not itself a sufficient basis. The court's main concern was not that the information was so insubstantial, but rather it needed further support. In the Spinelli case the affidavit fell short of the standards set forth in *Aguilar* and *Draper*. The Court further stated it was not retreating from the established propositions that only the probability and not the prima facie showing of criminal activity are the standards of probable cause. However, the unsupported assertion or belief of the officer does not satisfy the requirement of probable cause.

In *People v. Kopple, 245 N.E. 2d 134 (Ill. App. 1969)*, the court stated that the reliability of informants can be established in various ways and is not restricted to establishing previous reliability in terms of arrests, convictions, etc. In this instance, officers established reliability by obtaining information separately from two informants, who were unaware of each other's identity, and by checking telephone records as well as personal observation.

As a general rule, the prosecution in a criminal case has the privilege of withholding the identity of persons who have furnished information. However, in situations where no corroboration or reliability of the information is established, the informant's identity may have to be revealed. The case may have to be dropped rather than having the informant testify in court. Unless there is a previous agreement regarding the court appearance, an informant should not ordinarily be required to appear in court.

If the informant has done more than merely provide a lead, then it may be shown that he is a material witness whose testimony would be of value to the defense. The informant's testimony would be relevant to the accused's defense and essential to a fair determination of the case if the informant participated in the crime, assisted in planning the crime or was involved in some overt act encompassed by the crime. If the informant aided in the actual investigation by accompanying you to the crime scene, or helped with a surveillance, or if he observed the crime or was present when the defendant was arrested, his importance to the defense must be recognized.

# Discussion Guide

## PURPOSE

1.... To review the treatment of informants.

2.... To stress the use of records in the informant system.

3.... To discuss entrapment.

4.... To discuss the methods of paying informers.

## DISCUSSION QUESTIONS

1. In most contacts with individuals certain techniques must be followed in order to avoid disharmony. This problem is made complex by the clandestine nature of obtaining information. During the discussion review treatment of informants:

...avoid use of derogatory terms

...do not disclose the identity of the informant

...do not permit the informant to take charge of any phase of the investigation; keep control of the case

...express appreciation for all information received

...corroborate all information received; do not place too much trust in the informant

...keep all promises

...keep appointments

...investigate all leads

...impress upon the informant your personal integrity as well as the integrity of the department

...recognize and consider the personal problems of the informant without becoming involved

2. To insure proper and productive use of informants, your department should actively employ and supervise the informant system. Discuss some points to consider in maintaining the informant file.

A. The file should contain all relevant data:

...background investigation (occupation, associates, family, income, etc.)

...criminal record

...photograph and fingerprints

...attitude toward assisting the police

...places and time of contact

...method of payment

...resume of cases

...up-to-date evaluation on reliability

...identity of control officers

B. A cross-indexed reference file should be maintained:

...offer easy accessibility to officers

...indexed by more than one subject classification

...assigned code name or number of informant

...security of this file must be maintained

C. Only a few high-ranking officers should maintain the central file which contains the complete dossier of the informant. Entry into this file should only be made on a need-to-know basis.

D. A constant effort must be made to keep the file current.

E. Security is paramount. The system will be meaningless if some departmental members compromise their integrity.

3. Many times when you use an informant to establish a violation of law, you often find that you are on the borderline of entrapment. It is not uncommon or wrong to use decoys or provide opportunities for criminals with the view of establishing identity and procuring evidence to use against the criminal. This practice is frequently employed when evidence is difficult to attain as in cases of narcotics, counterfeiting, frauds, etc. However, you must not permit your zeal to involve you in a stiuation where you are the inciting cause of the criminal's commission of a crime.

A. Entrapment

...the act of a police officer or agent of the government inducing a person to commit a crime not contemplated by him, for the purpose of instituting a criminal prosecution against him.

B. Example of unlawful entrapment

(1) Incident

...you or an informer acting as your agent

...approach a suspect

...plan and execute a crime

(2) Defense

...through your instigation a person who had no intention of violating the law was lured into committing the offense

...you conceived the plan

...by trickery, persuasion or fraud you caused a citizen to perpetrate the crime

C. Principal facets of apprehending criminals and avoiding entrapment

...do not give consent to a crime

...for the criminal intent to originate in the mind of the accused.

D. Example of lawful decoys

(1) Incident

...officers in plainclothes go to a high crime area of muggings

...assume roles of feigned drunks in alleys

...apprehend muggers

(2) No defense

...practice does not offer official consent for a person to commit a crime

...intent originates with the mugger

...trickery, persuasion or fraud did cause the mugger to perpetrate the crime

...he was caught in his own devices

E. The technique of using decoys or providing opportunities to commit a crime does not constitute entrapment.

4. When buying information, generally the method of paying is collect on delivery. Accurate payment for information is important. When accepting information from paid informants you must prevent the informant from overselling the product and at the same time allow a fair price to encourage cooperation and assistance. Payment is generally in cash to prevent revealing the identity of the informant. You should maintain accounting information by using the informant's code number or name.

Case 1:23-cv-24467-KMM Document 237-1 Entered on FLSD Docket 04/24/2026 Page 6 of 30

# QUESTIONS

The following questions are based upon material in this Training Key. Select the best answer.

1. **For your department's use and for future utilization in case the investigation would require a court appearance, it will be necessary to establish the reliability of informants. When evaluating the informant's reliability you should consider:**
   (a) *income*
   (b) *motives*
   (c) *associates*
   (d) *criminal records*

2. **It is better to have one control officer to contact the informant than to have several different officers. If the control officer and the informant have personality conflicts, the control officer should:**
   (a) *immediately make a report*
   (b) *recommend that the informant be dropped*
   (c) *discuss the problem with the informant*
   (d) *ask the informant if he needs psychiatric help.*

3. **Generally any informant-police relationship could be subject to sharp public criticism. With female and juvenile informants this condemnation could result in malicious gossip. In order to avoid this you must:**
   (a) *never use prostitutes as informants*
   (b) *make sure the juvenile is over fourteen*
   (c) *not become involved or placed in compromising positions*
   (d) *always hold your meeting at the police station*

4. **All officers should have the opportunity to utilize an informant that may be of assistance in a case. To insure this and to maintain the integrity of the department, a cross indexed reference file should be maintained. This file should identify the informant by:**
   (a) *name, age and address*
   (b) *information he has access to and his name*
   (c) *coded name or number*
   (d) *serial number, address and associates*

# HAVE YOU READ . . .



CRIMINAL INVESTIGATION. Charles G. Vanderbosch, International Association of Chiefs of Police, 1319 18th Street, N.W., Washington, D.C. 20036, 1968. 303 pp.

*A text prepared from specially selected and edited Training Keys. Chapter II "Investigative Resources," Chapter IV "Rules of Evidence" and Chapter XVIII "Obtaining Information from People" outline many principles applicable to obtaining information from informants.*

POLICE OPERATIONAL INTELLIGENCE. Donald O. Schultz and Loran A. Norton, Charles C. Thomas Publisher, Springfield, Illinois, 1968. 204 pp.

*A discussion of intelligence theory is preceded by a definition of terms and concepts. The text provides an understanding of intelligence concepts as they apply to law enforcement; emphasis is placed on informant recruitment, interrogation and record keeping.*

THE INFORMER IN LAW ENFORCEMENT. Malachi L. Harney and John C. Cross, Charles C. Thomas Publisher, Springfield, Illinois, 1962. 84 pp.

*A narrative text from the authors' experiences and lectures in using informants in criminal cases. The discussion on recruitment and treatment is excellent. Earlier court cases are cited.*

# ANSWERS . . .

1. (b) **Motives.** Each of the answers will play a role in the informants evaluation, but motives should be carefully determined and evaluated. The obvious reason is not always the true motive.

2. (a) To prevent a valuable informant from being lost for good, make a report and have the situation evaluated for proper action.

3. (c) Not becoming involved or placed in a compromising position includes such acts as embracing a female informant and offering money to the juvenile without departmental or parental consent.

4. (c) Coded name or number. The purpose of the cross-indexed reference file is to let you find an informant from any number of different entries (such as associates, information he has access to, area, etc.). However, keeping his identity secret is paramount.

# *Planning*

Every police problem lends itself to systematic analysis; planning is the basic function that conducts the analysis. Planning helps to identify and select the best ways to achieve results. It bridges the gap between where we are and where we want to go by addressing itself to the problems of how we want to get there. This Training Key discusses the planning process.

# Training Key® # 159

The attention paid by police commanders to management in the last twenty years, and particularly in the last ten, has witnessed a significant increase in interest in planning as a formal process. Only recently, however, have police departments viewed planning as an essential activity. Previously, law enforcement considered its functions as emergency in nature and not subject to the need for a specific planning process. Traditionally the absence of planning has led to a reliance on intuition and guesswork, and random selection of alternatives.

The value of planning is no longer questioned. Planning is required on a conscious level even in the smallest agencies. Four fundamental factors point up the need to develop a planning process. These are:[1]

- To offset uncertainty in change
- To focus attention on objectives
- To achieve economical operation
- To facilitate control

Planning should precede the introduction of any program, system, or effort, and it should involve all units and levels of the police organization. Every member of the department should in some way help in determining unit goals and resources, and in finding ways to accomplish needed tasks. Without this planning, effective organization, direction and control is impossible. A well conducted planning process results in considerable saving of resources, both material and human.

## *The Need*

Police agencies are continually confronted with the need to cope with change—change created by social and community attitudes, legislation, legal interpretations, and administrative decisions. Your department must constantly review and clarify its continuing objectives, and at the same time develop methods and procedures to achieve newly defined goals. This is planning.

The planning most familiar to you occurs on a short-range, day-to-day basis, usually directed toward the solution of some specific problem, and requires very little research and analysis. (How are you going to patrol your area tonight to counter several reports of vandalism to parked cars?) Short-range planning is necessary in every police organization and serves a definite purpose. However, the planning function should not end there. The kind of planning needed most in modern policing is long-range in nature, designed to develop more effective operations. It usually involves much research, analysis, and perhaps experimentation.

## *Objections to Planning Units*

Two frequently heard objections to a formal planning unit are the result of attitudes in law enforcement that create an atmosphere hostile to the development of productive planning. They are described as distrust of the "scientific approach" to problem solving, and a general resistance to change.

Distrust of a more formal method of problem solving in law enforcement is exemplified by departments unwilling to recruit men with higher education, regarding them as "college professor types" and not "good, practical policemen." If this attitude is expressed by the command staff, there is no doubt that it will spread throughout the department and form an almost impenetrable barrier to systematic planning. The academic processes of experimentation and study are part of the planning procedure, and progress is not likely when such techniques are ridiculed. Much police planning will continue to be performed at the emotional level until cynical criticism is replaced by constructive interest.

---

[1] Principles of Management, Koontz and O'Donnell (McGraw-Hill, Inc., New York, N.Y., 1964), pp. 79-80.

To most people change is uncomfortable; it upsets their normal, daily routine and requires adjustments on their part. There is frequently an attitude of resistance and a desire to perpetuate outmoded or ill-conceived procedures, rather than admit that they can be improved. It is easier to police the same beat year after year than to realign boundaries periodically as the need for coverage changes. It is simpler to continue to use the same forms, even if they are inadequate, than to learn to use new ones.

To some, a change in procedure is an admission that the former way was wrong, so the suggested change is an implied criticism. The mere establishment of a planning unit leaves little doubt that change is imminent. Only the "perfect" method, technique, or procedure is not subject to improvement. How many perfect operations can you think of? Because change is continuous, planning must be also; few, if any, operations will be performed in the same way every day. However, just because a change results, it does not mean it is for the better. Change without planning often is as bad or worse than no change at all.

Uncertainty about changes creates physical and psychological problems giving rise to more alternatives, and the rightness of any decision becomes less sure. Planning can remove much of the uncertainty and chance in these operations, and if everyone involved understands "why," the change can be smoothly implemented.

## Planning Mission

The planning function, if it is to be complete, must include the entire management cycle in which research and development plays a key role. The planning mission is to:

**PLAN**: Analyze the situation and determine what is to be accomplished. Develop policies and procedures within which the plan will be implemented. Establish measurable goals, the attainment of which will accomplish the plan. Determine and evaluate all alternate courses of action. Develop a plan which will best implement the course of action selected.

**ORGANIZE**: Develop the function required to accomplish the mission. Group related functions. Define and establish organizational relationships. Assign responsibilities and delegate authority. Select and assign personnel and other resources. Insure good management through a workable span of control.

**COORDINATE**: Insure lateral and vertical communication throughout the organization. Establish standard operating procedures and administrative instructions. Coordinate programs and policies to insure balance among plans and actions. Promote intelligent cooperation and mutual understanding. Encourage acceptance of the organizational objectives, and integrate action toward a common goal.

**DIRECT**: Determine the extent of direction necessary, and select methods of communication which will convey to the pertinent elements of the organization the action desired. Motivate individuals and units toward the action desired; communicate the requirements; and supervise execution.

**CONTROL**: Determine the type and extent of control necessary. Implement control procedures. Evaluate established procedures. Review and analyze results and take any required corrective action.

## Planning Areas

The actual assignment of tasks will depend largely on the number of personnel available. However, there are three areas in which intensive and continuing planning is justified and basic.

**MANAGEMENT**: One philosophy is that the planning unit should do the things that a Chief would do if he had the time. And, indeed, the planning unit's activities should ease the Chief's and command staff's burden so that they will be free to direct, coordinate and control the department's operations. To do this, statements of policies and standardized, understandable procedures as well as definitions of duty, responsibility, and authority at every level of the organization, are required.

Management planning concerns equipping and preparing the department to do the job, rather than its actual operation as an organized force. All aspects of organization and management of personnel and material, and the procurement and disbursement of funds are mapped out in advance. This includes an organization plan (with definitions of the duties of the component units), budget, and procedures for accounting, purchasing, and personnel management (recruiting, training, rating, selection for promotion, discipline, and welfare).[2]

Management is also responsible for working out cooperative relationships with other governmental departments and community agencies. This has often been referred to as extra-departmental planning.

**OPERATION**: The work which the line divisions (patrol, traffic and criminal investigation) must accomplish is analyzed. The nature, time, place, task, etc., is measured in terms of manpower and equipment requirements. Once the desired objectives and procedures for their achievement are defined, the required men and equipment are assigned to each function.

Although each division has the responsibility to plan and carry out its particular field operation, the planning unit has to study the needs of the division. This study includes manpower allotment, distribution and operation methods. Actual decisions, however, are a matter of policy and the responsibility of the chief of police, with advice from the planning unit. Once the principal decision is made, the commander of each line division is responsible for the day-to-day planning to achieve the objectives and to meet unexpected needs. This procedure does not take away the authority of the commander to meet changing crime conditions; it does provide the line divisions with basic research in crime causation, manpower distribution, and even in the area of developing new techniques for a more effective job of crime prevention and law enforcement.

**PROCEDURES**: These plans constitute the "standard operation procedures" of the department and comprise every procedure that has been outlined and officially adopted as the standard method of action to be followed by all members of the department under specific circumstances. Such things as reporting regulations, records division operations, dispatching procedures, and procedures for stopping, questions, searching, handcuffing, and transporting persons are all included.[3]

To ensure that no confusion will result, procedural plans must be clearly and concisely stated. Each one must be

---

[2] Municipal Police Administration. International City Management Association, Washington, D.C., 1969 p. 214.

[3] Ibid., Municipal Police Administration, p. 214.

continuously studied and researched with appropriate modifications when required. These procedures are planned to guide officers in their duties and should be so complete that impulsive and arbitrary decisions by individuals are avoided and cannot be made without deviating from the standard procedure.

Tactical plans for handling parades, demonstrations, sports events and other community activities are prepared as procedure plans. Special operations such as those used by evidence technicians are also included.

## *Steps in Planning*

The mechanics of planning can be broken down into several phases, all directed toward achieving the desired results of the organization. If the mechanics of planning are not completely carried out, if one step is omitted or performed in a haphazard manner, problems will develop. There are five basic steps in planning.[4]

**RECOGNIZING THE NEED FOR THE PLAN:** A need for a plan must be recognized. However, it is not necessary to be confronted with an emergency situation (sudden rash of prisoner escapes, increase of police vehicle accidents, etc.) before making plans to handle such situations. Projection of possible future needs and contingencies is an integral part of planning. Critical or tactical problems and conditions should have priority, and then as they are resolved, attention can be given to the long range view. The need for a plan can be developed from statistical data and information on such things as coming events that may impose unusual burdens, crime variations (increases of robberies during winter months, shoplifting during weekends and holidays), and public events. This need can also be uncovered through inspections. Inspection is not an occasional process; it is continuing, and above all, straight forward. Stealth and deceit have no place in a good inspection technique. Inspections should discover a planning need before there is a breakdown and failure in a procedure. Needs, discovered after a breakdown or failure, reveal that a critical analysis was not made. Warning signs indicative of a need to review and analyze plans and procedures include: the injury of an officer, prisoner escapes, decrease in crime clearance, etc.

**STATEMENT OF OBJECTIVE:** There will be overall objectives for the entire organization and objectives for the component parts. The statement of objective will outline what is to be accomplished. It must be precise in order to designate the areas in which data is to be gathered and analyzed, and the areas in which details necessary to reach the objective are to be drawn. Here the objective (or often the problem) is isolated and clarified. Steps are taken to assure that the analysis concerns the cause, and not a symptom.

**COLLECTING AND ANALYZING DATA:** The plan is no better than the information used in its formation. This must be factual and pertinent to the objective. An objective and plan based on complete and accurate information can answer the questions: What? Where? When? Who? How? and Why?

There are several sources which can be drawn upon to provide the necessary data. Usually the first step is a review of the literature in the field. Generally, the subject would not need to have been studied previously by a police agency. There are few problems which a department will experience (especially in areas of personnel, budget, promotion, organization, etc.) that have not been handled in other activities. Internal records, reports, and documents will provide a basis for predicting operational needs and supplying data for systematic plans.

Most of the original ideas, opinions and suggestions leading to improvements come from individuals directly involved in the area of study. Those who face the problem daily will be able to provide information that is not otherwise obtainable. The line unit should not itself assume the responsibility for researching the problem, considering the proposals, studying their applications, and developing the procedures that make the plan operational. To do so will distract from the line division's objective. However, this does not reduce their participation in the planning process; it merely relieves them of tasks unrelated to their first task.

Care must be taken to appraise the accuracy of the facts used in planning because decisions made on erroneous facts have a small chance of being correct. After all available facts have been gathered, certain forecasts or assumptions have to be made. It is necessary at times to look ahead to be sure that future operations will not be adversely affected by current decisions. Of course, not all future events can be accurately predicted, but reliable forecasts can frequently be made.[5]

**DETAILS OF THE PLAN:** At this stage, on the basis of the analysis, it is necessary to decide which of the several and tentative courses of action would be best to outline and implement. The far-reaching effects of the decision must be recognized.

Planning must provide for alternative courses of action. Those that offer the least benefit should be eliminated so that the choices do not become confused by virtue of their number. Alternatives must be carefully evaluated and consideration given to all factors that might affect the future.

Now the plan must determine the course of action to be followed. This involves the decision-making apparatus where one of several plans may be adopted. When a final decision is made, lateral plans must then be drawn up. For example, in a disaster plan, sub-plans for fire equipment use, patrol car assignments, hospital emergency room procedures, and many other factors must be prepared.

**ACCEPTANCE:** After all of the plans have been detailed, it may be necessary to "sell it" to the people involved in using it. Generally, if the people involved in the new plan *participated* in its development, they can easily adapt to it. The failure to explain to all personnel their part in achieving large organizational objectives will result in their feeling that they are not a part of the system. Officers are expected to contribute toward at least one of the major organizational objectives, and this should be explained in sufficient detail.

When projects are undertaken by the planning unit, not only must attention be given to involving people in the affected units, but also care must be exercised in the manner of obtaining concurrence from them. When staff members do not concur, and the difficulty cannot be resolved, information to this effect should accompany the project when it goes to the chief for approval. The final determination on a contested plan must be made by the chief of police, and never by the planning unit.

---

[4] Police Planning, O. W. Wilson (Charles C. Thomas, Publisher, Springfield, Illinois, 1968) pp. 14-17.

[5] First-line Supervisor's Manual, Glen D. King and Others (Charles C. Thomas Publisher, Springfield, Illinois, 1970) p. 32.

# Discussion Guide

*NOTES*

## *PURPOSE:*

1. To discuss the PERT planning concept.
2. To discuss the various tasks of a planning unit.
3. To discuss completed staff work.
4. To discuss the flow of communication between planning personnel and other units.

## *DISCUSSION QUESTIONS:*

1. Many techniques, procedures, and systems have been developed to assist in planning. These aids have been most effective in a manufacturing or continuous type of production application. Among these techniques are the flow process chart, the Gantt chart (network diagraming), the milestone chart, and the time of balance chart. These techniques also have a place in police planning. A concept now being emphasized by the Department of Defense is PERT. Discuss this concept.

**A. Development**
**. . . PERT is attributed to the Special Projects Office, U.S. Navy (1958)**
**. . . increase emphasis on this concept started in 1968 by the Defense Department**

**B. What is PERT**
**. . . program evaluation and review technique**
**. . . an aid in planning and decision making**
**. . . based upon the network theory**
**. . . a simple technique useful in analyzing, planning and scheduling projects**

**C. Basic Concept of PERT**
**. . . use of a network to represent plans**
**. . . prediction of time needed to complete each project phase**
**. . . recognizing and measuring uncertainty**
**. . . continued revision of plans and operations to meet unpredictable situations**

**D. Operational steps to follow**
**. . . define project**
**. . . develop a work breakdown structure**
**. . . construct a network diagram**
**. . . calculate time**
**. . . determine critical path**
**. . . establish reporting system**

**E. PERT requires**
**. . . definition and establishment of positive objections**
**. . . a timely measurement of results against objectives**
**. . . continued updating of the network diagram showing what has been accomplished, how much time required, what must yet be done, and the estimated time required**
**. . . an approach to reallocation of resources to be made**
**. . . correction of observed deviations from objectives**

2. Planning personnel should prepare staff studies of problems relating to policy, procedures, and operations. One of the necessary tasks is the evaluation of the department's operations and administration for the purpose of developing new and improved procedures and recommending their approval. Additionally, the planning unit should be responsible for preparing and controlling the written directive system and all forms and reports. The general aims of this development and control are to improve the information provided by the system, in both quality and structure; to decrease the cost of each paper, record and file; and to facilitate retrieval of information.

**A. Specific responsibilities for planning**
**. . . design new systems and develop new procedures and methods**
**. . . provide written instructions for systems, procedures and methods**
**. . . prepare the necessary manuals to insure uniformity of performance.**

... assist in preparing material for training of the personnel who are to operate the systems. The planning staff member, of necessity, should have the background knowledge and insight into the concepts and procedures for the development of this training guide.

... participate in the implementation of any new system or procedure. The planning staff must supply the link between concept and execution to insure conformity. Once a system is installed and operating, system personnel must withdraw.

... review, analyze and improve existing systems, procedures and methods. Reporting, inspections, and other controls must be utilized to verify that anticipated benefits to the department have been achieved.

B. In addition to these general aims, a partial listing of specific planning projects is shown below. This list, although not all-inclusive, will provide an insight into some of the common problems which have been handled by many planning functions.

... long range budget forecast extending as far as five, ten, fifteen, and twenty years. This would include major projected capital outlays for equipment to meet estimated population changes, industrial expansion and possible annexation

... assistance in the preparation of crime studies

... cost analyses of police services in special areas

... analysis of position classifications in the department

... assistance in devising improved procedures for radio dispatching, searching and booking of prisoners, and preliminary investigations

... development of disaster plans and riot control plans

... analysis of court time of police officers

... study of recruitment practices

... analysis of the police aide or cadet system in terms of cost vs. performance

... formulation of guide lines for the preparation of annual reports

... study of various departmental safety programs in order to reduce line injuries

... analyses of special operations unit manpower deployment

... continuous examination of promotional standards and departmental examinations

... analysis of liability insurance programs available to the department

... liaison with other agencies to exchange information beneficial to resolving problems in the department

... providing outlines for police science programs in local universities

... development of civil defense plans

3. Completed staff work is the basis of planning. This concept has been defined as the study of a problem and presentation of a solution in such a form that all that remains is for the proper authority to approve or disapprove the proposal. The principal theme of this concept is to avoid presenting undeveloped or partially developed ideas that require time on the part of the approving authority to resolve. Briefly, completed staff work consists of the following elements:

... a concise statement of the problem

... statement of any assumption necessary for a logical discussion of the problem which cannot be accepted and considered as fact

... essential facts, in logical sequence, which must be considered

... a careful analysis of the essential facts and assumptions, presenting considerations pro and con, to arrive logically at sound conclusions and recommendations

... statement of the results derived from a recent judgment of the effects and implications of the essential facts

... complete, concise, and clear-cut statements of the action recommended, presented in such form that all the commanding officer has to do is indicate his approval or disapproval

... concurrences from personnel involved of the conclusion and the recommended action

... appendices containing descriptive material which is not essential to basic discussion, but which provides additional explanatory material exemplary of a discussion

... provision for supplemental information which could be added later reflecting the position and final action of the approving authority

4. There should be a free flow of communication between the planning personnel and each of the units concerned. However, once a project is committed to the planning section, a finished report on the subject should not be issued except over the approval of the director of the unit. No report should be prepared on a "private" basis for various individuals within the department. It is imperative that the relationship between the unit and the line function be made crystal clear by means of appropriate general orders.

# questions

The following questions are based on the material in this Training Key. Select the best answer.

1. The need for police planning is exemplified by which of the following statements?
   - *(a) The failure of many police officials' intuition in planning activities has hampered the police profession and it will take long range planning to straighten things out.*
   - *(b) The large, modern, complex police department needs a planning unit to fix responsibilities for tasks. If this is not done, a majority of the officers will be lax in their duties. Planning is not as important in small departments because the person who fails to perform can easily be identified.*
   - *(c) The police must meet the continuous need to cope with change.*
   - *(d) A need exists to bind the individual officers together and direct them to the achievement of effective law enforcement.*

2. At which level in the police department should participation in planning be required?
   - *(a) At every level and in every function, from the patrolman at a fixed post to the chief of police.*
   - *(b) At the command level, where experience is plentiful and officers have the time.*
   - *(c) Directly from the chief's office; it is only here that the organization's objectives, policies, and procedures are decided.*
   - *(d) By a formal planning unit, which is given the authority and responsibility to review and clarify field methods and procedures.*

3. The following is a definition of which planning area?
   "Plans mapped out in advance of all the operations involved in the organization and management of personnel and material and in the procurement and disbursement of money. Planning related to equipping and preparing the department to do the job."
   - *(a) Operations.*
   - *(b) Management.*
   - *(c) Procedures.*
   - *(d) Tactical.*

# answers

1. (c) The never-ending need to cope with change underlines the importance for a planning unit. It is necessary to constantly review and clarify continuing objectives, and at the same time develop methods and procedures to achieve newly defined goals.

2. (a) Every member of the department needs to participate in planning--not only to solving the problems they face daily but also to determine how best to accomplish a task, what resources and procedures are needed, and what the organization's objectives should be.

3. (b) Management. The other kinds of plans are concerned with actual operations.



## *Have you read . . .*

THE POLICE MANAGEMENT SYSTEM. Professional Standards Division, International Association of Chiefs of Police, 1319-18th Street, N.W., Washington, D.C. 20036, 1968, 64 pp.

*This text outlines the requirements of a manager. It is shown that these requirements can be met by giving proper attention to the various functional elements of the work of a manager, including the element of planning.*

# Glass as Evidence

Broken glass at the scene of a crime can be important physical evidence. On-the-scene examination of glass can establish the manner in which the crime was committed, and later laboratory analysis could tie a suspect directly to the crime. It is worth the officer's time and effort to evaluate the evidence provided by glass. Glass evidence is commonly encountered in burglaries, hit-and-run accidents, shootings and assaults.

Training Key® #202

Interpretation of glass fragments at the scene of a crime need not be left completely to a laboratory technician. The officer's investigative efficiency can be improved when he possesses a knowledge of what direct observation of glass can show, together with an awareness of how the laboratory examination can help him with the investigation. This Training Key will discuss how both on-the-scene examination and laboratory interpretation of glass evidence can be utilized to advantage.

Examination of a broken pane of glass at a burglary scene can establish whether the glass was broken from outside or inside the building. This knowledge could be important when suspicion of a faked burglary arises. Additionally, fingerprints, trace evidence adhering to the glass, and glass particles sticking to the perpetrator may help connect him to the crime scene.

Glass recovered at a hit-and-run accident can also supply valuable information. It may help identify which part of the fleeing vehicle was damaged, and it might even pinpoint the make and year of car involved. Other evidence, such as oversprayed paint on glass lenses when a car was repainted, may indicate the color of the fleeing vehicle. Later, glass from the scene may be physically compared with glass from a suspected vehicle. Some of the laboratory techniques for such comparisons will be discussed later in this Training Key.

In shooting incidents when bullets go through windows, the glass can become important evidence. The officer can conduct an on-the-scene evaluation and determine from which side of the glass the bullet was fired. Also the path of the bullet can be estimated, which could lead to the place from which the weapon was fired. If there was more than one shot through the window, proper evaluation could show which one occured first and from what direction.

If a person is assaulted with a glass bottle, it too can provide evidence. Fibers, hairs and blood may be found on the glass, or the assailant may carry particles away on his person. The possibility of the bottle yielding palm and fingerprints should not be overlooked. If the bottle itself is of an unusual type, it may even be linked to the suspect.

In cases where the criminal comes in contact with the glass, some glass fragments may be found adhering to the suspect's clothing. This glass, when properly collected and evaluated, may place the suspect at the scene of the crime. Comparison of glass collected at the scene and from the suspect could be part of the convicting evidence.

## Breaking Phenomena

Whenever force is applied to a sheet of glass, the glass bends in the direction of applied force. This is due to the elastic property of glass. Tension strain is produced on the side of the glass opposite the point of force application, and the glass at point of application is compressed. At the point of force, glass chips break loose and fly with considerable force. This causes the hole in the glass.




"The Training Key® is published by the Professional Standards Division of the International Association of Chiefs of Police. © 1973 by the International Association of Chiefs of Police, Eleven Firstfield Road, Gaithersburg, Maryland 20760. All rights reserved. No part of this publication may be reproduced, stored in any system, or transmitted in any form or by any means, electrical, mechanical, photocopying, recording or other means without prior written permission of the International Association of Chiefs of Police, Inc."

Radiating outward from the hole is a general pattern of lines from the point of impact. These are known as "radial" lines. There are also "concentric" or "spiral" lines in widening circles around the point of impact. These lines intersect the radial lines. At the point where the concentric fractures intersect the radial lines, the concentric lines are interrupted and stopped. This configuration resembles a spider web.

When the glass chips fly loose, most of them travel in the direction of the applied force, but as many as a third can fall backwards. This is significant for two reasons. The presence of large numbers of chips on either side of the broken glass does not of itself necessarily indicate from which side the force came. On the other hand, the pieces that fly back may lodge in the offender's clothing, and later be traced to the scene.

**RADIAL FRACTURES.** When the glass breaks, the lines that radiate from the hole are caused by the glass bending away from the point of impact. The radial fractures originate on the opposite side of the glass, because this is the surface which is the first to feel the tension. As the front of the glass is pushed in, the opposite side is bent backwards. When the limit of glass elasticity is reached, it breaks, with cracking resulting along the radial lines. This action can be illustrated by folding a piece of thick cardboard sharply; the back side of the cardboard (like glass) breaks first. The radial fractures precede the concentric breaks.




**CONCENTRIC BREAKS.** While the radial fractures are forming, triangles are created between the fractures. The newly formed triangle glass between the radial fractures also bends away from the direction of force. When the limit of elasticity for this triangle is reached, the glass breaks in concentric lines. Concentric fractures originate on the front of the glass.

Once again this point can be demonstrated with cardboard. On a piece of thick cardboard a sharp knife is used to cut radial lines running in all directions from a hole. Then finger pressure is exerted against a triangle, pushing it backward as far as possible. The cardboard will break in a concentric manner, with the break appearing on the front surface.

**CONCHOIDAL FRACTURES.** This section should be read carefully and illustration #3 studied with care. Once understood, however, it will reward the officer by showing him how to determine quickly from which side the glass was broken.

A characteristic of glass is that when it breaks, the fracture edges appear shell-like in form—that is, having elevations or depressions in the shape of a shell. The technical name for this condition is "conchoidal" fracture.

The surface edges of glass from a broken pane show curved lines, which are the expression of the conchoidal fracture. In order to determine from which side the glass was broken, the officer will need to examine these curved lines on the edge of the broken section. The direction of these lines will indicate the direction of the breaking force.

The curved lines are perpendicular to the side on which the fracture opens. Thus to determine the breaking direction properly, the officer needs to differentiate between a piece of glass from a radial break and one from a concentric break. One must remember that a radial break first occurs on the opposite side, while a concentric break, between two radials, occurs on the side of impact.

When examining the glass, the officer should select a piece near the hole, mark one side for identification (inside or outside) and hold the glass so that a broken edge is facing him. If the broken edge he is examining is a radial break, the conchoidal lines begin at right angles opposite to the side to which force was applied and curve toward the point of force. If the broken edge is a concentric break, the exact opposite will be observed. The conchoidal lines begin on the same side the force was applied.

Armed with this information about the direction of force, the officer may be able to support a complainant's claim or disprove it. What has been described is actually a simple procedure which should be followed routinely at crimes involving broken windows. On burglary calls, when entry was apparently gained by breaking a pane of glass, the officer should examine it and determine if it was broken from outside of the building.




## *Burglaries*

This section discusses forcible entry into a building through glass. For whatever reason a person breaks glass to enter a building the officer should always study the broken window carefully to determine how it relates to a crime.

In studying the window his first step is to observe the broken glass for adhering evidence. Clothing fibers, hair, and blood may be found on the broken glass. After this trace evidence is gathered, the glass can be taped in place. The glass is taped to prevent the broken pieces from falling out. The plastic or cellophane adhesive tape used for lifting latent fingerprints can be used.

Once the glass is taped, the officer should mark the glass (indicating the outside and inside), initial and date it, then remove a broken piece and study the curved lines on the glass edge to determine from which side the window was broken. If there is still doubt about the authenticity of the apparent way in which the glass was broken, the officer should obtain laboratory analysis. He should make sure that the glass pane is securely taped, with the outside and the inside identified. Then he can remove the window and send it to the laboratory.

The glass from a window may have been broken completely out, with the pieces lying on the ground immediately beneath. To reconstruct it and learn the direction of force, the officer must first determine which side of the glass fragments were the outside and which the inside of the window. Before that, however, he should note the distribution of the pieces without disturbing them. Once again, he will be looking for hairs, fibers and blood, and then for fingerprints and footwear impressions. After examination is completed, the officer can then proceed to reconstruct the window.

One way to distinguish the outside of the window is to see whether it appears to be weather beaten. When a window is exposed to the weather, the outside of the glass will have characteristic grime, dirt, or water spots. Another technique is to compare paint or putty adhering to the straight edge of the glass with paint on the window frame. The inside paint is usually different from the outside paint.

Once the proper side of the glass has been identified, the officer can reconstruct the window by piecing the large broken glass together. The glass pieces should then be studied and the radial and concentric lines determined. When this is accomplished, sections of the glass nearest to the hole may be examined for curved lines on the edge of the glass. This will determine the direction from which the window was broken.

## Auto Glass

Shatterproof glass is used in the windows of automobiles because the pieces do not scatter when broken. Shatterproof glass consists of two layers of glass with a layer of plastic between them. The glass is joined to the plastic under heat and pressure. When breakage occurs, the glass pieces stick to the plastic inner layer.

Frequently the cracking of the safety glass is not complete; that is, the radial and concentric cracks do not extend to the other side. If the glass is broken, however, an examination of the curved lines on the edge of the glass (the conchoidal fracture) can determine the direction of force. In situations where the window glass of a vehicle is to be examined, it is often necessary to tape the glass before opening the door. This may be necessary even before the officer opens the door to recover other evidence. If the window falls out and shatters into small pieces, it would then be nearly impossible to reconstruct the glass.

If the glass is not completely broken, the conchoidal fracture will not form. If this is the case, another test which can determine the direction of force is to run a finger along the surface of a window. If radial cracks are felt on one side only, then the officer can infer that the direction of impact was from the opposite side. Still another test which can be applied to safety glass depends upon its tendency to bend instead of shatter if not enough force is used to break the glass. The side on which the glass is struck will be found to be concave. This can be tested by laying a long straight-edge ruler on the glass and observing if there is space between the ruler and the glass. Determining from which side the auto glass was broken could be of value in establishing the authenticity of reported vandalism and larceny cases.

**HIT-AND-RUN.** Glass, even small fragments recovered from a hit-and-run accident scene, may be sufficient to establish the type of vehicle and eventually identify the particular car. The officer must be careful when he handles the glass since he may accidentally chip the glass fragments.

The large pieces lying on the ground should be placed together loosely in the manner of a jigsaw puzzle and taped to a piece of cardboard. Once a suspected vehicle is discovered, it may be possible to make a fracture match. Fracture matching is a mechanical fitting together of glass fragments. If pieces fit accurately with irregularities intermeshing and holding the pieces together, this examination can furnish conclusive evidence as to common origin. If the glass is in small pieces, and laboratory tests are needed to determine its characteristics, the fragments should be gathered together in a strong plastic container. They should not be placed in a metal container which may further damage the fragments.

Paint on glass is additional evidence which the officer may find at a hit-and-run accident. When cars are repainted, minute paint specks may have been unintentionally sprayed on the lenses of the car's lights. Hence, the discovery of these specks may indicate the color of the car.

## Assault with Glass Bottle

In cases of assault with a glass bottle, there are three possibilities for developing evidence. First, if the bottle is recovered, it should be examined for whatever trace evidence it can yield, such as fibers, hair or blood. These might come from the attacker as well as the victim, and should be subjected to laboratory analysis. Possibly, palm and fingerprints may be found on the bottle. Secondly, if the bottle is in any way unusual—is an antique, has a peculiar shape or contains strange substances—it may be possible to link it to a suspect. Thirdly, glass fragments may stick to the assailant's clothing. If there is glass on the suspect's clothing, a comparative analysis of the evidence should be obtained.

## Shootings

Generally, the hole produced in glass by a bullet will be small and have sharp edges. However, if a bullet has been fired from a very long distance and hits a window at a low speed, it will break the pane in much the same manner as a stone—that is, smash it instead of creating a clean hole. A shot a few inches from the glass will produce a similar result, because the pressure of the powder gas itself will smash the glass.

The direction from which a shot was fired can be determined from a characteristic flaking action. On one side of the glass numerous small flakes of glass will be found to have been blown away around the hole, creating a funnel or cone-shaped effect. The side on which the flaking appears is the side from which the bullet left the glass. If the bullet strikes the glass perpendicularly, the flakes will be spread evenly around the exit side of the hole. If the shot is fired from the right of the pane, there will be very few flakes on the right side of the exit hole—most of them will be on the left side. The more acute the angle from the right the more flakes will be blown away on the left side. The reverse is true, if the shot comes from the left.

When there are two bullet holes in a window, the problem of which one occurred first may be a major question. The answer may be important in determining the aggressor in an act of violence. To make this determination, the fracture caused by each bullet must be examined. It will be found that the fractures caused by the first bullet will be complete, especially the radial cracks, whereas the fractures from the second bullet will be interrupted and stopped at points where they intersect with the breaks from the first bullet.




In the illustration, Bullet Hole A was made before Bullet Hole B. The radial lines from Hole B stop at intersection Y, where they meet the previous lines from Hole A. Also, the concentric lines from Hole B stop at intersection X because they meet the previous cracks from Hole A.

## Glass Fragments in Clothing

When a person breaks glass to commit a crime, many small chips may adhere to him. This is caused by the fact that when glass is broken, chips fly backward toward the direction from which force is applied and stick to the person. Also, as the perpetrator crawls through the window, he will rub against the broken glass, and small fragments will adhere to his clothing. If the criminal steps on the glass, particles will stick to cracks in his shoes.

Most criminals overlook glass fragments when they attempt to conceal their actions. Often these glass chips adhere to the individual's clothing for a considerable length of time. This glass could well be strong convicting evidence.

Clothing which is suspected of containing glass chips should, if possible, be delivered to the laboratory without previously removing the fragments. This procedure allows the laboratory examiner to recover the fragments himself and gives him the opportunity to search for other trace evidence. Often the technician will use a vacuum cleaner device equipped with a special filter to obtain trace evidence. The material suctioned off of the clothing accumulates on filter paper. It will then be separated and analyzed in detail.

If the clothing cannot be delivered to the laboratory, the police officer should gather the fragments himself. If forceps are available, he can use them. Naturally, the officer can use his fingers. The recovered fragments should be placed in a clean pill box, vial or envelope. The container should then be sealed and labeled for safe preservation and proper identification.

When more than one glass object has been broken at the scene of a crime, glass from each object should be identified and placed in a separate container to be used as a standard for comparison purpose.

## Description

There are certain properties common to all types of glass, but glass also varies widely in physical and chemical composition and can contain many types of impurities. It is these differences in a particular piece of glass that make possible the laboratory comparison of glass found on a suspect and glass found at the scene of a crime.

Glass is a hard, noncrystalline material. Properties common to all glass are: hardness, elasticity and brittleness. Silica and metal oxides are the principal ingredients of almost all glass.

Other metal impurities such as iron, nickel or chromium may also be present. The color in glass is due to the presence of small quantities of these elements. For example, chromium or iron impart a green hue to glass; uranium oxides or cerium are used for a yellow color. About 90 percent of all glass produced is soda-lime glass. It is used in windows and bottles. Soda-lime glass consists of sodium and calcium oxides.

## Laboratory Tests

Laboratory tests of the object breaking the glass or of an individual's clothing may serve as a link to the scene of a crime. The laboratory can employ a number of different methods of examination to make comparisons. The officer should be aware of the different methods and their possibilities, even though he does not have to understand them completely.

These examinations include refractive index, dispersion, densities and spectographic analysis. Under specialized conditions, the examinations may reveal the specific source of the glass. Although there is some relation between the common window glasses, the probability of fragments from different sheets of glass having the same characteristics is unlikely. Most laboratory examinations can be performed with only minute quantities of glass.

## Summary

In summary, glass can be useful as evidence in three basic ways. First, it can yield traces that the criminal left behind, such as blood, hair, fibers or fingerprints. Analysis of this evidence can help place a suspect at the scene.

Secondly, the glass itself can provide important clues as to how the crime was committed, such as determining from which side the glass was broken; or the direction and angle at which a bullet entered the glass. If there is more than one bullet hole, it can be learned which shot was fired first. These determinations can often be made by the officer at the scene.

Thirdly, the criminal may have carried away small pieces of glass on his person or in his clothing. At the laboratory, these fragments might be matched chemically, physically, or even mechanically with glass from the scene of a crime, thus furnishing another method to place the criminal at the scene.

# Discussion Guide

1. Glass found at the scene of a crime can link a suspect to the offense by placing him at the scene. The criminal may have left identifying traces on the glass, or he may have carried away fragments adhering to his clothing.

A. Physical evidence found on glass at crime scene

. . . take photographs before removing the evidence.
. . . search carefully since the small traces of evidence easily can be destroyed.

(1) Fibers
. . . usually adhering to the edges of glass.
. . . when collection is with tweezers, check to see that no fibers are adhering to the instrument.
. . . package in individual containers.
. . . label containers.
. . . a microscope examination can determine the source and color of the fiber.
. . . fibers found at the crime scene and the suspect clothing can be compared.

(2) Hair
. . . usually adhering to the edges of glass.
. . . can be collected with tweezers.
. . . package in individual container.
. . . never secure hair to paper or cardboard with cellophane tape; this damages the evidence.
. . . microscope examination can determine the type of hair and the color.
. . . although hair cannot positively be identified as coming from a particular person, it can show that the hair did not come from certain other persons, thus becoming an important factor in the investigation.

(3) Blood
. . . the criminal may cut himself when he breaks the glass.
. . . the laboratory examination can identify stains found at the scene as blood.
. . . determine if it is human or animal.
. . . establish blood grouping.

(4) Fingerprints
. . . after collecting other trace evidence, the windows can be dusted for fingerprints.
. . . usually the fingerprints on glass will be identifiable and highly distinct.
. . . because the developing powder will obliterate other trace evidence, these items must be collected before the powder is applied to the glass.

(5) Footwear Impressions
. . . glass that has fallen to the ground may be stepped on by the criminal.
. . . photograph impression first.
. . . use commercial footprint lifter to lift impressions.

B. Comparison of glass fragments

. . . when a person breaks glass, some flying glass chips may become lodged on his person or possessions.
. . . these chips can be compared with the broken glass at the crime scene.
. . . as such, a standard (evidence from a known source) should be collected from the broken glass at the crime scene.

(1) Where to look
. . . clothing.
. . . shoes.
. . . instrument used to break the glass (gloves, hammer).
. . . suspect's hair at exposed area, such as arms.
. . . any possessions the suspect may have carried to or from the scene.

(2) Laboratory comparison
. . . the known standard will be compared with the suspected glass.
. . . physical properties of the two particles will be compared to see if they are from the same source.

2. Some evidence at the scene of a crime may be overlooked because it is small. During the discussion, review small evidence which may be overlooked.

A. Ammunition

(1) Bullets
. . . can indicate the type and caliber of weapon used in the crime.
. . . ballistics tests comparing bullet found with suspected weapon can be made.

(2) Cartridge Case
. . . marks from the firing pin, the ejector or the chamber may be matched against the suspected weapon.
. . . may also indicate the type of weapon used.

(3) Shotgun Shell
. . . determines the gauge of the gun used.
. . . marks from the firing pin and ejector can be matched against suspected weapon.

B. Tools

(1) Evidence adhering to tool
. . . examination may reveal trace of metal, wood, plaster, paint, glass or some identifying characteristic adhering to the suspected instrument.
. . . this can establish a relationship between the tool and the crime.

(2) Broken chips of the tool
. . . when using a tool to force an entry, chips may break off.
. . . an examination can associate a minute chip with a questioned tool.

(3) Tool marker
. . . irregularities on the surface of a tool will be transferred to the surface which the tool contacted.
. . . the tool marks found at the crime scene can later be compared to a suspected tool.

C. Soil

. . . samples of dirt can at times place a suspect at the scene.
. . . in hit-and-run accidents, samples of dirt loosened by the impact can be compared with soil on the suspected vehicle.
. . . this holds true for unusual soil around buildings and also other dust-like material such as safe insulation, wood shaving, sawdust.

Acknowledgement

The Northern Illinois Police Crime Laboratory (Highland Park, Illinois) provided valuable assistance in preparation of this Training Key.

# questions

The following questions are based upon material in this Training Key. Select the best answer.

**1. A police officer investigating a crime which involves a broken window can best determine from which side the window was broken by:**

*(a) Looking to see on which side of the window the most glass has fallen.*
*(b) Studying the conchoidal fractures.*
*(c) Determining on which side of the glass the hole is the largest.*
*(d) Examining the area where the radial fracture meets the concentric break.*

**2. When there are two bullet holes in a window, the officer can determine which one was made first:**

*(a) He cannot, because the breaks overlay.*
*(b) By studying the conchoidal fractures on the edge of the glass.*
*(c) By examining the flaking characteristic.*
*(d) By determining which fractures are interrupted and not complete.*

**3. Which one of the following statements is true about laboratory examination?**

*(a) Fragments possessing the same properties can be said to have come from the same source.*
*(b) Only when a large quantity of glass is found on the person or instrument can laboratory tests be conducted.*
*(c) Because common window glasses have similar properties, laboratory tests cannot establish that the suspected glass did come from the known standard.*
*(d) The only laboratory test which can be performed with glass is called "Spectographic Analysis."*

# answers

1. (b) By a study of the conchoidal fractures (curved lines on the edges of glass) on a radial or concentric break, the direction of force can be determined.

2. (d) The fractures caused by the first bullet will be complete, whereas the fractures from the second bullet will be interrupted and stopped at points where they intersect with breaks from the first bullet.

3. (a) Although there is some relation between the common window glasses, the probability of fragments from different sheets of glass having the same characteristics is unlikely.

## *Have you read...*



**Scientific Police Investigation.** Fred E. Inbau, Andre A. Moenssens, and Louis R. Vitullo, Chilton Book Company, Philadelphia, Pa., 1972, 204 pp. (Available through IACP, 11 Firstfield Road, Gaithersburg, Maryland 20760).

*The text's primary purpose is to make a police officer aware of the existence and basic uses of the scientific aids that are most generally available. It also explains what he must look for and do in procuring and preserving the evidence that is to be subjected to scientific scrutiny.*

Training Key® #225

# Case Preparation

**The success of criminal prosecutions is in large measure dependent on how well police officers conduct and report investigations. The prosecution report is especially important because it serves as a means of assisting the police officer in organizing his case for prosecution and is often used by prosecuting attorneys as an outline for courtroom case presentation. Failure of police officers to prepare adequate prosecution reports, which typically leads to the decision not to prosecute, negates the value of their efforts in the other investigative areas and results in wasted time and manpower.**

Because of the unprecedented increase in the number of criminal cases in recent years, prosecuting attorneys seldom have the time to personally review all of the factors relating to each case that they evaluate. Often they must depend on the prosecution reports submitted by police officers when deciding whether or not to prosecute and when preparing cases for court. What this means to the police officer is that he must place as much emphasis on preparing a case report as he does on conducting an investigation and making an arrest.

Case preparation is not an isolated activity that the police officer undertakes after a suspect has been arrested. It is typically a lengthy process that begins the moment the officer arrives at the scene of a crime and does not end until the officer testifies in court. Preparing an adequate case for court generally consists of documenting everything of significance that takes place during an investigation leading to an arrest. From the typically massive documentation of investigative and arrest reports and field notes, the officer prepares a condensed prosecution report. The purpose of the prosecution report is to provide a formal procedure for assisting the officer in organizing his case for prosecution; to provide assistance to the prosecutor by outlining the case, listing witnesses, and evidence; and to furnish the prosecutor with the necessary supporting reports and documents concerning the case and the accused.

In addition to the report, the police officer should help to prepare any witnesses for the trial, and he must be ready himself to face the judge, jury, and defense attorney.

## On-Scene Arrest

The preparation of a court case begins at the same time that the police officer becomes involved in an incident. The officer's report and testimony will show how the incident was brought to his attention, what actions both he and the suspect took, and why an arrest was warranted. Consequently, whenever a police officer approaches an incident, he must keep in mind that his actions will have to be reported and therefore meet the standards necessary for successful courtroom presentation and prosecution.

An important requirement of the prosecution report is that it contain the police officer's probable cause for making an arrest or search. For example, an officer stops a vehicle because it meets the description of a car used in a robbery. The officer further observes that the occupants match the broadcast description of the robbery suspects. The driver becomes agitated and the occupants appear nervous. Based on the probable cause established by the police officer's observations, he arrests the suspects and searches the vehicle. In his report of the apprehension, the officer must record all of the information that justified the vehicle stop, arrest, and search. This would include the time of the robbery and the radio broadcast, exact location where he first observed the suspect vehicle, his distance from the vehicle, the factors that matched the suspect vehicle to the information he had, and his observations and descriptions of the vehicle's occupants.

This type of detailed information is important not only to the prosecutor, but it also is necessary for the officer to accurately testify in court. If an officer states something on the witness stand that is not reflected in his report, his value as a witness is greatly diminished.

## Arrest After Investigation

At the scene of a crime, the police officer's investigation should focus on the evidence required for successful prosecution. The objective of the officer is to build as strong a case as possible. To accomplish this, the officer must recognize, collect, and prepare all physical evidence, obtain the statements of witnesses, and make a report of the investigation. No piece of evidence, regardless of how insignificant it may appear to be, should be disregarded. In

court, cases are frequently won or lost on details that by themselves may seem inconsequential but which, in the total context of a crime, assume great importance.

Photographs, measurements, and diagrams can be an important part of case preparation, assisting the court and the jury to better understand the relationship between the offense and crime scene and the evidence. During an investigation, the officer should imagine himself as a member of the jury hearing witnesses' testimony about the crime. If the jury is assisted in visualizing the crime scene, the testimony about the facts will have more meaning and be more convincing. The police officer should therefore make every attempt to capture the crime scene with photographs, sketches, and diagrams. Besides being able to provide visual aids including photographs and diagrams, the officer should also be able to sketch the scene on a blackboard for the court.

Weaknesses in reports often occur because they are not prepared promptly. Frequently, an officer will be required to respond to several calls, one right after another. Although he takes notes at each incident, he may wait to complete the reports in detail.* Unless accurate notes are taken, some fact or statement will undoubtedly be forgotten when the officer does prepare the reports. It will be in the courtroom that he wished he had completed a detailed report immediately after handling each incident.

What also frequently occurs is that the more serious the crime, the more likely it is that the police officer will write reports when he is physically and emotionally fatigued. For example, an officer has been at a burglary scene that has taken some time to examine. The officer's tour is over, and he wants to get away from the job and especially "paperwork." So he writes an abbreviated report: "pry marks on rear door, a broken screwdriver found, prints found on screwdriver and cash register." Weeks or months later when the case finally comes to trial, the defense attorney attacks the chain of evidence. He asks the police officer to describe exactly where the evidence was located at the scene, who touched it and how it was maintained as evidence. The police officer will not be able to remember and if his investigative report has been inadequately prepared he will not be able to produce the needed information. In these circumstances, the testimony of the police officer would be impeached and the case lost.

The point here is that, regardless of physical or emotional fatigue, the police officer should write a complete and accurate report as soon as possible after an incident.

*Ideally, in minor cases such as petit larcenies, the officer should hand print the results of his inquiry regarding each call directly on a report form without interim or "scratch notes." This, of course, makes legible hand printing a key part of the report preparation process because the officer's report is the final product. In complex cases, such as a burglary or armed robbery, the officer should record the evidence in his notebook and then prepare the report. This report should also be hand printed in the field.

## Officer's Notes

In addition to writing accurate and complete reports, the police officer should diligently keep notes in his notebook when he handles a complex case. Often this type of case will not come to trial until long after the investigation has been completed. If the officer has made thorough notes, the lapse of time between the completion of his investigation and his appearance in court will not detract from his testimony. Too frequently there is a tendency to leave to memory facts that should be written down. This is especially so during incidents that leave a "big impression," where the officer believes that what he has experienced will never be forgotten.

The rule police officers should follow in case preparation is to not trust memory. Most persons cannot recall facts such as dates, times, weather conditions, distances, and measurements without referring to notes. The court recognizes this and permits officers to use their original notes to refresh their recollections while testifying.

The notes should be on loose-leaf paper contained in a binder. Only those notes to be used in the trial should be brought to court. In court, the defense attorney has the right to inspect the officer's notes if he is using them to testify from. Therefore, when the notes are requested, the officer should remove them from his binder and hand over only the loose-leaf paper. There have been cases where the defense attorney has found other items in an officer's notebook that served to confuse the case and impeach the officer's testimony in the eyes of the jury.

When the officer anticipates the necessity of referring to original notes during his testimony, he should be familiar with their location in his notebook. A hasty, disorganized search through the notebook tends to create an unfavorable impression of the officer in the eyes of the jury.

## The Prosecution Report

Preparation of the prosecution report is based on all of the officer's reports. It should be a condensed but concise outline of the case. The report should be prepared in the case of every arrest where the matter will be formally presented by a prosecuting attorney. Primarily, this will occur in connection with felony matters. The exhibit is a prosecution report developed by IACP. Regardless of whether this report or some other form is used, the report should cover the following basic information.

1. *Defendant's Name* — Indicate last, first, and middle name of the defendant. If more than one, list the others in Item 15.

2. *Sex-Race-Date of Birth* — Self-explanatory.

3. *Complaint Number* — Include police central complaint number.

4. *Charge* — Show offense defendant is charged with. If several, continue below.

5. *City of State* — Check the block indicating jurisdiction representing place where the charge is filed.

# PROSECUTION REPORT

1. DEFENDANT'S NAME | 2. SEX | RACE | D.O.B. | 3. COMPLAINT NO.

4. CHARGE (IF MULTIPLE LIST COMPLAINT NOS. BELOW) | 5. ☐ CITY ☐ STATE | 6. ARREST NO. | 7. DATE OCCURRED

8. ATTACHMENTS

☐ ARREST REPORT ☐ OFFENSE REPORT(S) ☐ SUPPLEMENTAL REPORT(S) ☐ LOCAL RECORD SHEET ☐ FBI RECORD SHEET ☐ STATEMENT

9. DATE/TIME ARRESTED | 10. LOCATION OF ARREST

11. ORIGINAL CHARGE | 12. OFFICERS WHO MAY TESTIFY

| 13. CO-DEFENDANT(S) | NAME | CHARGE | SEX | RACE | D.O.B. |
|---|---|---|---|---|---|
| ☐ NONE | | | | | |
| | | | | | |

CODE: C— COMPLAINANT P—PARENT/GUARDIAN V—VICTIM IF DIFFERENT FROM COMP. W WITNESS

| 14. NAME | CODE | RESIDENCE ADDRESS | CITY | RES PHONE | BUS PHONE |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

15. INSTRUCTIONS (A) ADDITIONAL PARTIES - LIST ADDITIONAL WITNESSES, ETC., ADDITIONAL CHARGES, ADDITIONAL CO-DEFENDANTS. (B) THE CRIME - GIVE BRIEF SUMMARY DESCRIPTION OF CRIME, LIST PROPERTY STOLEN AND RECOVERED AND DISPOSITION (C) TESTIMONY - BRIEFLY INDICATE WHAT TESTIMONY MAY BE PROVIDED BY EACH WITNESS (D) EVIDENCE - BRIEFLY DESCRIBE EACH ITEM OF PHYSICAL EVIDENCE, ITS PRESENT LOCATION, WHO WILL PRESENT AT COURT (E) ELEMENTS OF OFFENSE - LIST THE LEGAL ELEMENTS OF THE OFFENSE(S) CHARGED AND INDICATE WHO CAN TESTIFY OR PRESENT EVIDENCE AS TO EACH ONE (F) REMARKS - PROVIDE ANY ADDITIONAL INFORMATION OFFICER CONSIDERS HELPFUL TO PROSECUTOR. USE SUPPLEMENTAL REPORT IF ADDITIONAL SPACE IS REQUIRED.

19. COMPLAINT NO.

16. PREPARED BY | NO. | 17. APPROVED BY | NO. | 18. DATE | PAGE NO OF

6. *Arrest Number* — Show department arrest number.

7. *Date Occurred* — Show date offense occurred.

8. *Attachments* — Indicate documents and reports provided to prosecutor with this report.

9. *Date/Time Arrested* — Self-explanatory.

10. *Location of Arrest* — Identify the exact location of the arrest.

11. *Original Charge* — Show charge originally placed against accused if different than item 4 above.

12. *Officer Who May Testify* — List the officer(s) in best position to testify as to the circumstances of the arrest or investigation.

13. *Codefendant(s)* — Check block if there are no codefendants. Otherwise, list codefendants with charge, sex, race, and DOB.

14. *Complainant-Witnesses* — List other parties involved in matter as outlined, using appropriate code.

15. *Narrative* — Complete this item by following the instructions on the form.

16-18. *Self-explanatory.*

19. *Complaint Number* — The complaint number will be entered in the lower right-hand corner of the report as a method of double checking the number for correctness and to facilitate filing.

## Preparing Witnesses

The officer has duties beyond transmitting the case to the prosecution. He should also help prepare witnesses for their court appearance. Since most witnesses do not have any previous courtroom experience, they need to be familiarized with the procedures followed in court. Witnesses who testify in court without being prepared to do so are at a distinct disadvantage. Their self-confidence and value as witnesses are likely to be threatened by the official proceedings.

The police officer should explain to the witnesses that, if they are called to testify at a preliminary hearing or a trial, they will probably be subject to intensive cross-examination by the defense attorney. Although the function of the defense attorney may be well known to most witnesses, they may not be aware of the courtroom tactics that are used to help achieve the objectives of the defense. The officer should explain that the tactics may include attempts to confuse, insult, or embarrass witnesses so that they lose composure and discredit their own testimony. The role of the prosecutor, as the state's agent in the proceedings, should also be reviewed with the witnesses.

Witnesses should be made aware that they are not legally obligated to discuss the case with the defendant or his attorney before the case goes to trial. Whether a witness decides to do this is entirely at his own option. In no circumstances should the officer tell state witnesses *not* to discuss the case with the defense. To do so would jeopardize the state's position at the trial.

## Conferring With the Prosecutor

Thorough case preparation requires close cooperation between the police officer and the prosecuting attorney. It makes little sense for a police officer to conduct a lengthy and complicated investigation if the attorney does not intend to prosecute the case. Following the preliminary involvement of the police in an incident, especially a major felony, the prosecutor's office should be consulted. By working together, the prosecutor relies on the investigative techniques and skills of the police, and the police rely on the skills of the prosecutor in handling legal issues and are guided by the legal framework outlined by him. This type of cooperative effort reduces the number of cases where the charges are dropped due to insufficient evidence or other case weaknesses.

Regardless of whether a major or a relatively minor case is involved, the police officer should consult with the prosecutor prior to the court proceeding. This pre-trial conference has several purposes. First, it is used to make the prosecutor more specifically aware of what the officer can competently testify to. Second, it is held to clear up any involved and obscure points in the case. Third, since the officer is more familiar with the defendant and witnesses than the prosecutor, the officer may be able to supply him with helpful information about their personalities and characteristics. Last, this discussion puts the attorney and the officer in a better position to anticipate the defense.

After the court proceeding is over, the police officer will also find it valuable to confer with the prosecutor to review the courtroom presentation of the case. This is especially so after a case has been lost. The post-trial review with the prosecutor will assist the officer in determining how better case preparation might strengthen similar cases in the future.

## Officer Preparation

The police officer's final pre-trial task is to prepare himself for the courtroom scene. There is no excuse for a law enforcement officer to enter court unprepared. In general, the police officer should check all personal notes and police reports pertaining to the case at hand. The officer should be certain that he has at his fingertips the answers to all of the "who, what, when, where, why, and how" questions that may be asked.

Specifically, the officer should review any of the following factors related to his case:

- Crime scene — including details of the crime, victim, witnesses, search and seizure.
- Physical evidence
- Probable cause for arrest
- Reliability and credibility of informants
- Warrants and affidavits
- Prior statements
- Exhibits — sketches and diagrams
- Confessions of suspects
- Defendant's story

The police officer's mental preparation for testifying in court is no less important than his knowledge of the case. It is no easy task for a police officer to testify and face cross-examination. The prospect of speaking in front of a judge, jury, lawyers, and fellow officers often produces feelings of anxiety, nervousness, and tension. These are normal emotions that occur because people are never sure that they will behave as they would like to. The problem occurs when these emotions become uncontrollable and result in psychological reactions such as excessive perspiration, dryness of the mouth, trembling of the voice, and shaking and general muscle tensions. These in turn lead to halting, ineffective, and unconvincing testimony. Anxiety distracts the speaker from his ideas and prevents him from concentrating on facts and their meanings.

These symptoms can be controlled and to some extent prevented. If the officer has made a thorough investigation, has the facts well arranged, and has taken all the other steps needed for proper case preparation, he has nothing to fear during the trial.

## Summary

Case preparation begins as soon as the police officer becomes involved in an incident. Whether he makes an on-scene arrest or conducts a lengthy investigation before apprehending a suspect, the police officer must document thoroughly all of the details of the case. From his reports and field notes, the officer prepares a prosecution report, which the prosecuting attorney uses in evaluating and trying the case. The police officer and prosecutor typically confer at a pre-trial meeting to clarify the facts of the case and prepare for the trial. Witnesses should be familiarized with and prepared for court procedures, and the officer himself must be ready to testify.

# Discussion Guide

1. The final phase of the police officer's participation in a case is his testimony in court. Poor preparation for testimony by the officer can destroy all the hard work put into a case by him and others. Discuss the following witness guidelines for police officers:

. . . LISTEN to the question.
. . . UNDERSTAND the question.
. . . ANSWER only the question asked.
. . . ALWAYS tell the truth.
. . . Do not argue with the defense attorney.
. . . Speak slowly and distinctly while on the witness stand.
. . . Answers should be brief and to the point.
. . . Do not give an answer you are not sure of.
. . . Be candid — if you do not know an answer, say so.
. . . Be careful of "yes" or "no" questions that cannot be answered in that way.
. . . Do not memorize testimony.
. . . Give only the facts, not your interpretations of what happened.

2. The written report is a very important part of the police officer's case preparation. The better the officer's report is, the stronger the case against the suspect is likely to be. Discuss the following qualities of the written report:

A. Accuracy
. . . The report should be made up of factual information.
. . . Names, descriptions, addresses, and the like should be double-checked.
. . . The feelings or opinions of the officer are proper only when called for and must be identified as such in the report.

B. Clarity
. . . The language and format of the report should be simple and to the point.
. . . The facts should be presented in logical sequence.
. . . Most often, the facts should be in the order that they occurred.

C. Completeness
. . . All available information should be included in the report.
. . . Memory should not be depended on in any circumstance.
. . . No information should be withheld for any reason.

D. Brevity
. . . Do not include unnecessary words or descriptions.
. . . But DO give all the facts.

E. Promptness
. . . Reports should be prepared as soon as possible after an incident.
. . . Time incident occurred, time it was reported, and time of investigation should be noted in report.

3. The police officer's physical appearance in court is often as important as his testimony. Many people will judge the officer based on the way he looks as much as on what he says. Review the following suggestions for police officers appearing in court:

. . . If a uniform is worn, make sure it is clean and neat.
. . . If civilian clothes are called for, a conservative suit should be worn.
. . . Shoes should be well shined and the socks conservative in color.
. . . No pins or rings representing membership in any organization should be displayed.
. . . Do not testify with weapon visibly on person.
. . . Be clean shaven, have hair trimmed and fingernails clean.
. . . Do not smoke or chew gum.
. . . Posture should be erect.
. . . Calmness and confidence should be projected to attorneys, judge, and jury.

# questions

The following questions are based on material in this Training Key. Select the best answers.

1. Witnesses should be informed that they:
   *(a) Are not to discuss the case with anyone prior to the trial.*
   *(b) Should discuss the case with the defense attorney before the trial.*
   *(c) Are not obligated to discuss the case with the defense attorney before the case is tried.*
   *(d) Should not discuss the case with the defendant.*

2. Several objectives are achieved at the pre-trial conference between the prosecutor and the police officer. Which one of the following is *not* usually a goal of the pre-trial meeting?
   *(a) To study the case.*
   *(b) To clarify any obscure points in the case.*
   *(c) To anticipate the defense.*
   *(d) To supply the prosecuting attorney with information about the defendant and witnesses.*

3. The purpose of the prosecution report is:
   *(a) To relieve the overworked prosecutor of the need to read the case reports.*
   *(b) To serve as a transmittal form, so the police will have proof that the case was sent to the prosecutor's office.*
   *(c) To be used as a check list procedure to ensure that the officer has covered all of the important investigative functions.*
   *(d) To assist the officer in organizing the case for prosecution and serve as an outline of the case for the prosecutor.*

# answers

1. (c) The witnesses should be told that they do not have to discuss the case with the defendant or defense attorney before the trial; however, if they wish to do so, it is permissible.

2. (a) Before the pre-trial conference, the officer and prosecutor should have reviewed the case file; this conference is to put the final touches on the case.

3. (d) The prosecution report is a condensed but concise outline of the case. This assists both the police officer and the prosecutor.

# *have you read . . . ?*

"Enforcement and Prosecution — A Joint Endeavor." *FBI Law Enforcement Bulletin*, March 1972.

*This article provides pointers to officers preparing cases for court presentation.*

"A Prosecutor Looks at the Police." *FBI Law Enforcement Bulletin*, November, 1972.

*This article establishes a mutual understanding between the police and the prosecutor.*

Case 1:23-cv-24467-KMM Document 237-1 Entered on FLSD Docket 04/24/2026 Page 25 of 30



# Epilepsy: Recognition and First Aid

**Epilepsy is a misunderstood human condition. The term epilepsy is commonly — and erroneously — associated with uncontrollable seizures, mental retardation, or emotional instability. Actually most of those afflicted with epilepsy never experience violent seizures and lead normal lives. But because certain persons with epilepsy do occasionally have seizures in public, police officers must be able to identify accurately and respond appropriately to such occurrences.**

The term epilepsy, which is derived from a Greek word meaning seizure, refers not to a single condition but to a variety of conditions that are markedly different in severity and kind. Epilepsy occurs among all races and ethnic groups and in all strata of society. Seventy-five percent of cases of epilepsy develop before the age of eighteen years. Approximately 2 million Americans suffer from some form of epilepsy.

Epilepsy is an episodic disorder. Epilepsy impairs physical abilities only during the seizure itself and for the recovery period. Most persons with epilepsy, therefore, have only a sporadic disability. Those whose seizures have been completely controlled with medication over a period of years have a good prognosis for remaining seizure-free.

A common factor among all forms of epilepsy is its symptom — a sudden discharge of electrical energy in the brain resulting in seizures. The nature of the seizure depends on the extent and location of the electrical malfunction in the brain.

The causes of epilepsy, like its forms, are numerous: fetal brain injury, mother's illness during pregnancy, lead poisoning, childhood infections, brain tumors, stroke, or head trauma. Despite recent medical advances, however, in approximately half of all epilepsy cases, no specific cause is identifiable.

## Characteristics of Epilepsy

Epileptic seizures have varying degrees of effect on consciousness. In certain cases, persons with epilepsy realize that they are experiencing a seizure but they are powerless to control it. They may be able to hear and respond in a limited manner to other people but are unable to communicate while the seizure continues. Other seizures may involve lapses of consciousness so brief that the victims are unaware that a seizure has taken place. There may be altered consciousness in which individuals are unaware of their surroundings while the seizure lasts. Finally, victims may lose consciousness for a brief period of time.

Seizures are of short duration and do not usually impair action once they have ended. Seizures may typically last from a few seconds to several minutes. Fortunately, the physiological process that initiates a seizure also triggers natural brain mechanisms that inhibit and finally bring the seizure activity to a halt.

While not completely predictable, approaching seizures can be sensed by a substantial number of people with epilepsy, who can then use the warning period to move away from hazard or seek privacy where the seizure can take place without disrupting others. This warning sensation is called an "aura", which is actually a part of the seizure itself.

Seizure incidence and frequency vary dramatically among individuals. Yet each person tends to establish a pattern of frequency which, after treatment and a period of adjustment to treatment, can reasonably be expected to continue. For example, an individual who has been seizure-free for five years has an excellent statistical chance of continuing to be seizure-free for the next five years. A person who has consistently experienced seizures will probably continue to do so unless a successful medical regimen is discovered.

## Types of Epilepsy

Epilepsy takes several forms, depending on what part and how much of the brain is affected by the disturbance of its normal electrical activity. The idea

that a typical epileptic seizure is a generalized convulsion or "grand mal seizure" is much too limited to fit the current concept of the disorder. There are many types of epileptic seizures and variations, and combinations of more than one of these types may occur in the same individual.

Today scientists divide epileptic seizures into two main categories, depending upon the degree to which the brain is affected by the seizure activity. Seizures which involve most of the brain areas are called *generalized seizures;* disturbances affecting only a part of the brain are referred to as *partial seizures*.

**GENERALIZED SEIZURES:** There are two kinds of generalized seizures. One is the *generalized tonic-clonic seizure* which some people still refer to as *grand mal*. This is the seizure most frequently associated with epilepsy by the public. The seizure typically lasts about 2 minutes although it is possible for it to continue for a longer period of time. It takes the form of a sudden loss of consciousness, often accompanied by a cry which is caused by a sudden expelling of air from the lungs as the body muscles tighten and the person becomes rigid.

Immediately following the tonic phase comes the clonic phase. This involves jerking movements of the head, arms and legs. When the clonic phase ends, there is a gradual return to consciousness.

During the seizure the individual's skin may take on a bluish tinge and breathing may appear to stop briefly. These characteristics of a generalized tonic-clonic seizure feed the misconception that the person having a seizure is in danger of choking or swallowing his tongue. It is not possible to actually swallow the tongue.

Confusion and fatigue are common during the period immediately following a generalized tonic-clonic seizure, but it is important to remember "after effects" of a seizure are individualized. One person may be able to return to normal activity within a very short time; another individual may require a longer rest period.

Generalized tonic-clonic seizures respond well to anticonvulsant medication, and many people with this type of epilepsy maintain complete and reliable control.

The second major form of a generalized seizure is called *absence*. It may still be referred to by its original name of *petit mal*. Absence seizures are brief lapses of consciousness usually lasting only a few seconds. The person who has absence seizures is often unaware that they have occurred. To the casual onlooker, the seizure appears to be a brief period of unresponsiveness that may not be recognized as a seizure at all. There is no effect on muscle tone and no period of confusion afterwards. Absence seizures are most common in children and may disappear after adolescence. It is possible, however, for adults to experience absence seizures, and the frequency of the episodes often depends on the individual's response to antiepileptic medication. As in other forms of epilepsy, this response may range from total control to recurrent occasional seizures. No first aid is required for this type of seizure.

**PARTIAL SEIZURES:** A *simple partial seizure* is one that begins in a specific part of the brain and does not spread to involve other areas. Consciousness may not be impaired. The seizure may cause the individual having it to experience temporary distortions of smell, vision, hearing, or sensation. The nature of these feelings indicate that the seizure activity is taking place in the part of the brain that controls these particular sensations. The Jacksonian type of simple partial seizure causes involuntary movements of parts of the body. It may begin as jerking of the finger, then the hand, and later the arm. Similar actions may involve the leg. If the seizure activity continues to spread, it may become generalized, and a tonic-clonic seizure may result. Whether or not the seizure spreads varies with the individual and his or her response to medication.

The second type of partial seizure is known as *complex partial seizure*, and is also commonly referred to as psychomotor or temporal lobe epilepsy. This is a common form of epilepsy in adults. During a complex partial seizure, the individual is either completely unaware of his surroundings, or his consciousness is substantially impaired. He may feel fear or anger, or distortions in taste, sound or hearing; he may typically go through a series of motions of which he has no conscious knowledge. These are called automatisms. The automatic behavior may take many forms: smacking lips or appearing to chew, fumbling with clothing, restlessness, walking, running or cowering in apparent fear. To the onlooker, the person appears as if he is sleepwalking, or intoxicated in some way. Although a wide range of automatic behavior is possible during a complex partial seizure, each individual develops a distinctive pattern so that, once established, it can be assumed that each subsequent seizure will follow the same form. Although quite complex actions — such as buttoning or unbuttoning a shirt — are possible during this type of seizure, there is no directed purpose in them, and the person may have no memory of his actions during the seizure.

A period of confused consciousness may follow the seizure, which lasts a few moments or longer, depending on the individual. The frequency of complex partial seizures, as with other epileptic seizures, depends on the individual and the degree of control that medication has produced.

## First Aid

Both generalized and partial seizures may generate fear and over-reaction in persons who observe a seizure and are unfamiliar with epilepsy. In these circumstances, police assistance should be cautious yet decisive. Because an individual with epileptic seizures may exhibit behavioral characteristics similar to drug or alcohol intoxication, the responding officer must initially evaluate the situation before acting.

Prior to administering first aid or requesting medical assistance, the police officer should check for emergency identification. Many persons suffering from epilepsy wear medical bracelets or necklaces that will immediately clarify the situation for the officer. The officer may also ask bystanders whether they know the person and if he suffers from a medical disability. Many persons with epilepsy, however, do not wear medical identification or confide in associates because of the social stigma attached to this condition.

When the officer can determine that the individual is experiencing an epileptic seizure, he may use the following first aid guidelines, however, if the cause of the condition cannot be determined, the officer has no choice but to request medical assistance.

**GENERALIZED:** An individual suffering a generalized seizure normally should not require special assistance. Most seizures last only a few minutes. In many cases, the convulsions may have ended by the time competent help is available. If the person is conscious, he should be allowed to rest and then encouraged to go about his regular activities. If he is unconscious, neckties, tight clothing, and belts should be loosened. A soft coat or similar pillow substitute should be placed under the head. The head should be turned gently to the side to allow drainage of saliva and mucous from the mouth. A responsible person should stand by until he has fully recovered consciousness. No special efforts should be made to arouse or restrain the individual. Awakening should be voluntary.

If the convulsion is continuing when help comes, the individual should, again, not be restrained or held in any way. He should be allowed to remain in the same place for the duration of the seizure, unless this is a precarious location, as in a busy street. If necessary, he may be moved to prevent injury from hard or sharp objects. If possible, however, these hazards should be moved and not the patient.

In certain cases, it may be necessary to apply a minimum restraint to the person, generally because of a potentially dangerous environment. In these circumstances, he may be turned on his side and held by a firm grip on the shoulder until the convulsions have ended.

It is physically impossible for the person to swallow his tongue during a seizure. However, he may bite his tongue or cheek as his teeth become tightly clenched. Never force anything between the teeth. If a well-meaning but untrained bystander has already placed an object in the victim's mouth, a medical emergency may exist requiring an ambulance. By this time the tongue has or has not already been bitten and there is no point in forcing the mouth open. Attempts to do so often cause damage to the teeth and gums. Further damage may result if fragments of broken teeth are taken into the lungs during a deep breath before the person becomes fully conscious.

If the mouth is open at the onset of the seizure, a handkerchief, or other soft material, may be placed between the side teeth to prevent tongue biting. Do not use a pencil or similar hard object that may shatter in the mouth and become lodged in the throat. If an appropriate object is not at hand, it is best to do nothing.

**PARTIAL:** The major problem in handling of partial seizures is the recognition of the symptoms. The unusual behavior of the partial seizure victim may often be mistaken for that of one who is intoxicated. A cardinal rule in the handling of any epileptic seizure is that the person should not be restrained in any way unless it is essential for his personal safety. This is particularly true in the case of a partial seizure. Here the individual may react physically to the restraint although he will not be aware of his actions.

The observable effects of an average partial seizure is about fifteen to twenty minutes. During the seizure, the individual is in a confused mental state, but is usually amenable to suggestions and comments made in a pleasant and friendly manner. It is possible to control the actions of the person in this way for the duration of the seizure unless it is a very long one. For example, the officer can direct the person away from potential danger as he walks about. If any question still remains, the individual should be examined by a physician, preferably a neurologist.

**STATUS EPILEPTICUS:** In some instances, an individual may experience a condition known as "status epilepticus." In this condition, the individual goes from one seizure into another without regaining consciousness. This condition may last for several hours and is a definite medical emergency. The person should be placed in a hospital or under the immediate attention of a physician. Emergency medical attention should be obtained immediately. Whenever a seizure lasts for 10 or more minutes, the officer should assume that the victim is experiencing status epilepticus.

## Epilepsy and Drugs

There are a great variety of anticonvulsant drugs used by persons with epilepsy to alleviate their condition. Officers should be familiar with these drugs for several reasons. Under certain circumstances, an epileptic seizure may be mistaken for intoxication or drug abuse, leading to the arrest of an innocent party. Indeed, a person with epilepsy may be mistakenly arrested for possession of his prescribed medication. Persons with epilepsy who are on a lifetime medication program do not necessarily carry their medication in a prescription bottle like the occasional user of medicine. Epilepsy drugs may be carried loose in pockets or purses or in personalized containers or pouches. In addition, an individual may be arrested on an unrelated charge yet he will need to have access to his medication. The following chart lists the drugs and their possible side effects used in the treatment of epilepsy.

**Possible Side Effects of Drugs Used in the Treatment of Epilepsy***

| Drug | Some Possible Side Effects |
|---|---|
| Atabrine | Abdominal pain, diarrhea, nausea, skin discoloration, vomiting |
| Celontin | Dizziness, drowsiness, gastrointestinal upsets, headache, skin rash |
| Clonopin | Drowsiness, unsteady gait, weight gain, emotional upsets |
| Dexedrine | Insomnia, restlessness, weight loss |
| Diamox | Depression, dizziness, drowsiness, loss of appetite, numbness in arms and legs, skin rash |
| Dilantin | Blurred or double vision, dizziness, drowsiness, gum swelling, hair growth or loss, headache, skin rash, speech impairment, stomach upsets, unsteady gait, blood destruction |
| Gemonil | Drowsiness, excitability, hyperactivity, speech impairment, stomach upsets, skin rash |
| Luminal | Drowsiness, excitability, hyperactivity, speech impairment, stomach upsets, skin rash |
| Mebaral | Drowsiness, excitability, hyperactivity, speech impairment, stomach upsets, skin rash |
| Mesantoin | Double vision, drowsiness, skin rash, speech impairment, stomach upsets, swelling of glands, low white blood count, hepatitis |
| Milontin | Stomach upsets |
| Mysoline | Dizziness, drowsiness, headache, sexual impotence, inarticulate speech, stomach upsets, temper outbursts, skin rash |
| Paradione | Drowsiness, inarticulate speech, sensitivity to light, stomach upsets, blood destruction |
| Peganone | Depression, dizziness, double vision, drowsiness, headache, skin rash, swelling of glands |
| Phenurone | Depression, headaches, loss of weight, nausea, irrational behavior, stomach upsets, jaundice |
| Tegretol | Blurred vision, drowsiness, skin rash, stomach upsets, blood destruction |
| Tridione | Dizziness, headache, loss or thinning of hair, sensitivity to light, stomach upsets, swelling of joints, blood destruction |
| Valium | Blurred vision, dizziness, fatigue, stomach upsets, unsteady gait |
| Zarontin | Drowsiness, nausea, headache, sleep disturbances, stomach upsets |

*Harry Sands and Frances Minters, *The Epilepsy Fact Book*, Charles Scribner's Sons, New York, 1977, p. 29

**ACKNOWLEDGMENT**

The assistance of the Epilepsy Foundation of America in the preparation of this Training Key is greatly appreciated.

# Discussion Guide

1. Two medical emergencies that must not be confused by the police officer are diabetic coma and insulin shock. In diabetics, insulin is not produced in sufficient quantity to use starches and sugar in the body so the patient must take insulin, typically by hypodermic injection. When a diabetic fails to take insulin, he becomes confused, disoriented, stuporous, and falls into a coma. When there is too much insulin in the blood, and thus too little sugar in the blood, insulin shock occurs. This condition may be caused by an overdose of insulin, failing to eat soon enough after taking insulin, or undue exertion. In both instances medical attention should be sought immediately.

Discuss the difficulty in distinguishing between the two emergencies and the danger if first-aid measures are inappropriate.

A. Diabetic Coma

**. . . When a diabetic fails to take insulin, he becomes confused, disoriented, stuporous, and falls into a coma.**
**. . . The victim's breath has a sweetish odor.**
**. . . The victim's skin is very dry.**
**. . . He may be nauseous and vomiting.**
**. . . There is no evidence of skin blueness or obstruction of the air passages.**
**. . . Administer liquids, except those containing starches or sugar.**

B. Insulin Shock

**. . . This condition occurs when there is too much insulin in the blood which results in too little sugar in the blood.**
**. . . The cause of insulin shock may be an overdose of insulin, failing to eat soon enough after taking insulin, or undue exertion.**
**. . . The victim has moist, clammy skin.**
**. . . His color is ashen-white.**
**. . . The victim's breathing is slow and shallow.**
**. . . If victim is conscious, question him about condition and obtain sugar for him.**
**. . . If unconscious, place sugar under his tongue.**

2. In medical emergencies, bystanders and victims alike may become very emotional and less inclined to reason and respond in a rational manner. Indications that a person is unable to cope with the situation include profuse sweating, trembling, nauseated, or confused thought. Discuss the following emotional reactions to emergency conditions.

A. Panic

**. . . Quite often panic infects others in the group, spreading from person to person.**
**. . . Panic usually occurs among those who are only slightly injured or perceive the possibility of injury.**
**. . . Panic may lead persons to needlessly endanger themselves.**
**. . . Panic must be controlled promptly before it can spread.**

B. Depression

**. . . Depressed persons may stand or sit as though numbed, gaze vacantly, and be unable to communicate effectively.**
**. . . Depression of this sort is an attempt to be psychologically removed from the emergency situation.**
**. . . Such persons must be given direction and led by officers.**

C. Overactive

**. . . These persons will move around rapidly without purpose of movement.**
**. . . They will talk rapidly, make suggestions, make pointless comments.**
**. . . They should be controlled to keep their influence on others at a minimum.**

D. Body Reactions

**. . . Victims or witnesses may display weakness, trembling, crying, vomiting.**
**. . . Often these reactions occur after danger has passed.**
**. . . Their reactions are not disabling and recovery is relatively quick.**

E. Hysteria

**. . . This person has in effect a disabled mind.**
**. . . He may believe erroneously that some part of his body may be injured.**
**. . . For example, such a victim may not be able to see although physiologically there is nothing wrong with his vision.**
**. . . Such a victim should be treated for shock and receive immediate medical attention.**

# questions

The following questions are based on material in this Training Key. Select the best answers.

1. The basic difference between a generalized seizure and a simple partial seizure is that

   *(a) the generalized seizure is found among adults only.*
   *(b) the brain areas affected are different.*
   *(c) the generalized is the most common seizure among children.*
   *(d) the latter does not require medication.*

2. Which of the following conditions definitely requires emergency medical attention?

   *(a) grand mal seizure*
   *(b) tonic-clonic seizure*
   *(c) status epilepticus*
   *(d) petit mal seizure*

3. Most persons with epilepsy can be best described as

   *(a) suffering from a delibitating disease.*
   *(b) unable to properly function in everyday life.*
   *(c) subject to periodic, violent seizures that can be controlled by drugs.*
   *(d) capable of leading normal lives with proper care.*

# answers

1. (b) The generalized seizure affects more areas of the brain than does the simple partial seizure.

2. (c) In status epilepticus, the person experiences continuous generalized seizures without regaining consciousness for lengthy periods.

3. (d) Most persons with epilepsy have a mild form of the condition that can be controlled by use of medication.

# *have you read . . . ?*

Harry Sands and Frances Minters, *The Epilepsy Fact Book*, Charles Scribner's Sons, New York, 1977, 116pp.

This text, prepared in coordination with the Epilepsy Foundation of America, gives an overview of the nature of epilepsy. Chapters are devoted to the causes and effects of the condition, the treatment of epilepsy, personal problems caused by the condition, and children with epilepsy.